**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| NATIONAL ASSOCIATION OF BENEFITS AND INSURANCE PROFESSIONALS,<br><br>*Plaintiff*,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, and DR. MEHMET OZ, in his official capacity as ADMINISTRATOR OF THE CENTERS FOR MEDICARE & MEDICAID SERVICES,<br><br>*Defendants*. | Civil Action No. ________ |

**COMPLAINT FOR DECLARATORY JUDGMENT, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, AND A WRIT OF MANDAMUS**

1. Open enrollment in Affordable Care Act ("ACA") plans for coverage in 2027 begins on November 1, 2026. Before enrolling individuals in health-care plans, agents and brokers — who are already vetted and licensed by state regulators — must also complete federal training and registration. That registration permits them to enroll individuals on the federal exchange or state-based exchanges that use the federal platform. Without it, they cannot do their jobs or assist people who come to them looking for help in navigating their options.

2. But the Department of Health and Human Services ("HHS") recently adopted a rule authorizing the Centers for Medicare & Medicaid Services ("CMS") to declare a moratorium on registrations. And CMS simultaneously used that newly conferred authority to bar "new" agents and brokers from becoming eligible to enroll individuals in health-care plans when open enrollment begins. CMS estimates that its moratorium will prevent about 19,000

"new" agents and brokers — often new only in the sense that they did not register for Plan Year 2026 — from registering. Many of those individuals are, or work for, members of Plaintiff National Association of Benefits and Insurance Professionals ("NABIP").

3. NABIP brings this lawsuit to challenge the unlawfully adopted rule and the arbitrary moratorium CMS imposed, which punishes many thousands of agents and brokers for the actions of a relatively small handful of people whom the moratorium does not affect at all. NABIP seeks an immediate ruling vacating the rule and moratorium, and compelling CMS to conduct the new agent and broker training promptly, so that NABIP's members and employees of those members can complete the training in time for open enrollment.

4. While CMS took several actions to delay the start of training for Plan Year 2027, nothing official occurred until September 22, 2026. That day, the Federal Register posted, for public inspection, an HHS "interim final rule" — adopted without notice and comment and made immediately effective as of the date of public inspection posting — that gives HHS and CMS the authority to "impose a temporary moratorium pausing agent and broker registrations with the Federally-facilitated Exchanges" whenever "HHS determines that agent and broker conduct poses an unacceptable risk" to Exchange operations. Interim Final Rule and Moratorium,[1] 91 Fed. Reg. at 60334 (promulgating 45 C.F.R. § 155.220(o)).

5. Relying on that newly afforded authority, CMS simultaneously declared a moratorium on "new" agents and brokers registering with the Federally-facilitated Exchanges for Plan Year 2027, to start on September 22, 2026, and to remain in effect until February 1, 2027.

[1] *See* Interim Final Rule With Comment Period, *Patient Protection and Affordable Care Act; Temporary Moratoria on Certain Agent and Broker Registration To Participate in the Exchanges*, 91 Fed. Reg. 60317 (Sept. 23, 2026) (promulgating 45 C.F.R. § 155.220(o)) ("Interim Final Rule and Moratorium").

The result is that "new" agents and brokers will be locked out of those exchanges for the entire open enrollment period (November 1, 2026 through January 15, 2027), when most ACA health-care plans are purchased. *Id.* at 60320-22.

6. As shown in the declarations attached to the contemporaneously filed Motion for a Temporary Restraining Order, Preliminary Injunction, and Writ of Mandamus, these HHS and CMS actions irreparably harm NABIP's members. They will forever lose income, employment, and goodwill because of their inability to participate in this year's open enrollment.

7. The public will suffer irreparable harms as well. Last year, agents or brokers assisted in more than 75 percent of plans purchased through HealthCare.gov. Losing the CMS-estimated 19,000 new agents and brokers from open enrollment this year will likely mean that many individuals seeking that help will be unable to find it.

8. In contrast, the harm to the federal government is negligible. HHS and CMS retain all the tools necessary to address any fraudulent sign-ups during open enrollment. NABIP supports the Administration's efforts to root out fraud in the health-care system. But penalizing thousands of agents and brokers for the actions of a relatively small handful of people is not the way to achieve that laudable goal.

9. The Court should vacate the new HHS rule authorizing moratoria as well as the moratorium CMS announced under that new rule. And it should grant a temporary restraining order and preliminary injunction, or issue a writ of mandamus under 28 U.S.C. § 1361, compelling CMS to conduct new agent and broker training and to permit new agents and brokers to register, so they may participate in open enrollment when it begins on November 1, 2026.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because NABIP's claims arise under the Patient Protection and Affordable Care Act and the Administrative Procedure Act, 5 U.S.C. §§ 704, 706.

11. Because an actual controversy within the Court's jurisdiction exists, this Court may grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202. The Court also has authority to grant mandamus relief to compel the Administrator of the Centers for Medicare & Medicaid Services and the Secretary of the Department of Health and Human Services to perform a duty owed to NABIP. *See* 28 U.S.C. §§ 1361, 1651.

12. Venue is proper in the District of Maryland under 28 U.S.C. § 1391(b)(1), (e)(1) because the CMS Administrator resides in this District.

## PARTIES

13. Plaintiff National Association of Benefits and Insurance Professionals is a nonprofit trade association headquartered at 999 E Street NW, Suite 604, Washington, D.C. 20004. NABIP represents more than 100,000 licensed health insurance agents, brokers, general agents, consultants, and benefits professionals through more than 200 chapters nationwide. NABIP sues on behalf of its members, who would have standing to sue in their own right. Protecting their ability to register and serve those seeking coverage through the Federally-facilitated Exchanges is germane to NABIP's purpose, and neither the claims asserted nor the relief sought requires individual members to participate.

14. Robert F. Kennedy, Jr. is the Secretary of the Department of Health and Human Services, the headquarters of which are located at 200 Independence Avenue SW, Washington, D.C. 20201.

15. Dr. Mehmet Oz is the Administrator of the Centers for Medicare & Medicaid Services, the headquarters of which are located at 7500 Security Boulevard, Baltimore, MD 21244.

## STATEMENT OF FACTS

### A. The Role of Agents and Brokers in the Affordable Care Act

16. In 2010, Congress enacted the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010). Among its many provisions, the ACA established Health Benefit Exchanges, government-regulated online marketplaces where individuals and small employers can directly compare and purchase affordable, private health insurance plans known as qualified health plans ("QHPs"). 42 U.S.C. § 18031(b)(1).

17. The ACA directs each State to establish an American Health Benefit Exchange, and provides that the federal government, acting through the HHS Secretary (the "Secretary") and CMS, shall establish and operate a Federally-facilitated Exchange ("FFE") in any State that cannot or will not establish its own American Health Benefit Exchange. 42 U.S.C. §§ 18031(a), 18041(c). CMS administers the FFEs, including the HealthCare.gov platform. A State Exchange and HHS may enter into a Federal platform agreement (referred to as State-based exchanges that use the Federal platform, or "SBE-FPs") to rely on HealthCare.gov to perform eligibility and enrollment functions. 45 C.F.R. §§ 155.106(c), 155.20, 155.200(f). The HealthCare.gov platforms currently serve consumers in approximately twenty-nine States.[2]

18. Licensed agents and brokers play a critical role in the ACA's enrollment infrastructure. The statute establishes grants for "Navigators" to provide general information

[2] *See* States by Marketplace Type (FFM/SBM-FP/SBM) for Plan Year 2027, CMS, https://perma.cc/L9L8-NKW6.

about the availability of coverage, 42 U.S.C. § 18031(i), and individuals may theoretically enroll in coverage on their own. But as a practical matter, agents and brokers serve as the primary channel through which millions of people learn about available health insurance options, compare QHPs based on price, quality, and coverage, and complete the enrollment process each plan year. Agents and brokers provide individualized guidance to consumers navigating complex eligibility determinations, subsidy calculations, and plan selections — functions that are essential to the ACA's objective of expanding meaningful access to affordable coverage, particularly for low-income and underserved populations. During open enrollment in 2026, agents or brokers assisted in more than 75 percent of plans purchased through HealthCare.gov.

19. Congress directed the Secretary to "establish procedures under which a State may allow agents or brokers to enroll individuals and employers in any qualified health plans." 42 U.S.C. § 18032(e)(1). The Secretary subsequently promulgated 45 C.F.R. § 155.220, which requires that any agent or broker who enrolls qualified individuals first "[r]eceive[] training in the range of QHP options and insurance affordability programs." *Id.* § 155.220(d). These requirements apply on an annual basis, meaning agents and brokers must complete registration and training each plan year before they are authorized to assist consumers with Exchange enrollment.

20. CMS has historically administered this annual training through the Marketplace Learning Management System ("MLMS"), which is accessible via the CMS Enterprise Portal. In 2015, the Secretary promulgated 45 C.F.R. § 155.222, which established a process for approved third-party vendors "to offer training . . . as an additional avenue to the available [federal] training by which State licensed agents and brokers could complete the training requirements

necessary to assist consumers seeking coverage through the FFEs."[3] Despite the fact that third-party vendors often received higher satisfaction scores than CMS's own training, an overwhelming majority of agents and brokers completed training on the MLMS, in part due to restrictions imposed on those vendors.

21. Earlier this year, the Secretary completed a rulemaking that terminated the third-party vendor program, which, because of the restrictions, never served more than 10 percent of the agents and brokers receiving training. Plan Year 2027 Rule,[4] 91 Fed. Reg. at 29601. The Secretary gave assurance that eliminating that option "would affect neither the quality of nor access to agent/broker annual training" and "stated that agents and brokers would continue to have the ability to access training through CMS' existing Marketplace Learning Management System (MLMS) platform." *Id.* In response to comments expressing concern about the loss of that alternative training option, the Secretary twice underscored that "[t]o ensure that agents and brokers are able to meet Exchange requirements and receive the latest information on assisting consumers in the Exchange, *we will continue to offer* free FFE training to agents and brokers annually through CMS' MLMS." *Id.* (emphasis added).

22. With the vendor option now eliminated, the MLMS is the only means by which agents and brokers can satisfy the annual training requirement in Section 155.220(d). As HHS explains, agents and brokers "generally enter into 1-year Exchange agreements with CMS" that "automatically terminate prior to the following plan year's Open Enrollment Period." Interim

---

[3] Final Rule, *Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2016*, 80 Fed. Reg. 10750, 10790 (Feb. 27, 2015).

[4] *See* Final Rule, *Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2027; and Basic Health Program*, 91 Fed. Reg. 29526 (May 20, 2026) ("Plan Year 2027 Rule").

Final Rule and Moratorium, 91 Fed. Reg. at 60319. Before entering into those agreements, they "must complete annual registration, which includes . . . completing required training." *Id.*

**B. CMS Delays Agent and Broker Training for Plan Year 2027**

23. CMS has maintained an established practice since the inception of the FFE of administering or facilitating new agent and broker training each plan year. Each year, CMS provides separate training curricula for "new" agents and brokers — those who did not complete the prior year's registration and training — and for "returning" agents and brokers who have completed the prior year's program. Regardless of administration, that training ordinarily begins in July or August, preceding the November 1 start of open enrollment for that plan year.

| Plan Year | Training Start Date |
|---|---|
| 2014 | August 30, 2013 |
| 2015 | July 7, 2014 |
| 2016 | September 15, 2015[5] |
| 2017 | August 1, 2016 |
| 2018 | August 1, 2017 |
| 2019 | August 1, 2018 |
| 2020 | August 7, 2019 |
| 2021 | August 19, 2020 |
| 2022 | August 30, 2021 |
| 2023 | August 18, 2022 |
| 2024 | August 1, 2023 |
| 2025 | August 1, 2024 |
| 2026 | September 22, 2025[6] |
| 2027 | September 15, 2026 *returning agents and brokers only* |

[5] The start of training for Plan Year 2016 was delayed primarily due to CMS's migration to the MLMS, which was (then) a brand-new platform that replaced the Medicare Learning Network that was used for training in the prior two plan years.

[6] The start of training for Plan Year 2026 was delayed as CMS responded to the partial stay issued in *City of Columbus v. Kennedy*, 796 F. Supp. 3d 123 (D. Md. 2025).

24. But even though the Plan Year 2027 Rule contained repeated assurances that CMS would continue to offer training for both new and returning agents and brokers, CMS did not even schedule the initial webinars for new and returning agents and brokers until August 11 and August 12, respectively,[7] only to cancel them without explanation.

25. CMS then held a webinar for *returning* agents and brokers only on September 10 and opened training about a week later.[8] Therefore, all agents and brokers who registered for Plan Year 2026 — including those who were "new" for Plan Year 2026 (because they had not registered for Plan Year 2025) — can complete the training and registration necessary to assist consumers with Exchange enrollment when open enrollment begins on November 1, 2026.

26. The day after CMS held the returning agent and broker webinar, it became public that — one week earlier — CMS had submitted to the Office of Management and Budget ("OMB"), for review under Executive Order 12866,[9] a document entitled "Private Health Insurance; New Agent/Broker Registrations for Plan Year 2027 Moratorium Guidance."[10] The text of the document was never publicly disclosed, and CMS withdrew it on September 16, 2026.

---

[7] Health Insurance Marketplace Bulletin (Aug. 4, 2026), https://perma.cc/D9T3-39TB.

[8] Health Insurance Marketplace Bulletin (Sept. 3, 2026), https://perma.cc/X5RM-F8NC.

[9] This Executive Order, in place since 1993, requires federal agencies to submit certain regulatory actions to the Office of Information and Regulatory Affairs, within OMB, for review before they take effect.

[10] The title and date submitted (and withdrawn) can be found by searching reginfo.gov for RIN 0938-ZC07. A preserved copy is available here: https://perma.cc/QHD8-Z9JM.

### C. The Interim Final Rule and Moratorium

27. On September 22, 2026, the Interim Final Rule and Moratorium was made available for public inspection.[11] The document was then published in the Federal Register the next day, effective as of September 22, 2026.

28. HHS first promulgated a new legislative rule, codified at 45 C.F.R. § 155.220(o), which authorizes HHS (or CMS on delegated authority) to "impose a temporary moratorium pausing agent and broker registrations with the Federally-facilitated Exchanges . . . of agents and brokers that do not have a current Plan Year registration" whenever HHS "determines that agent and broker conduct poses an unacceptable risk to the accuracy of the Exchange's eligibility determinations, Exchange operations, applicants, enrollees, or Exchange information technology systems."

29. Neither Section 155.220(o) nor the document published in the Federal Register defines what makes a risk unacceptable or what kind of conduct, by how many agents and brokers, is required to declare a moratorium. The rule sets no threshold, identifies no factors for the agency to weigh, and places no limit on how long a moratorium may last or how many agents and brokers it may cover.

30. The APA requires notice and comment before an agency adopts a legislative rule, 5 U.S.C. § 553(b)-(c), and an agency may skip that procedure only in rare circumstances,

[11] *See* Interim Final Rule With Comment Period, *Patient Protection and Affordable Care Act; Temporary Moratoria on Certain Agent and Broker Registration To Participate in the Exchanges* (Sept. 22, 2026), https://perma.cc/5LLT-UPWK. The Office of the Federal Register daily discloses a list of items that will be published in the Federal Register on the following business day. Once disclosed for public inspection, a rule becomes "duly fixed," *GPA Midstream Ass'n v. U.S. Dep't of Transp.*, 67 F.4th 1188, 1195 (D.C. Cir. 2023), and "becomes 'valid' against the public at large," *Humane Soc'y of the United States v. U.S. Dep't of Agric.*, 41 F.4th 564, 570 (D.C. Cir. 2022).

including by satisfying the narrow and limited good-cause exception, *see id.* § 553(b)(B); *see also Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) ("We have repeatedly made clear that the good cause exception is to be narrowly construed and only reluctantly countenanced.") (cleaned up); *United States v. Johnson*, 632 F.3d 912, 928 (5th Cir. 2011) ("It is well established that the 'good cause' exception to notice-and-comment should be read narrowly in order to avoid providing agencies with an 'escape clause' from the requirements Congress prescribed.") (cleaned up); *Zhang v. Slattery*, 55 F.3d 732, 746 (2d Cir. 1995) ("[T]he 'good cause' exception . . . is not a catch-all.").

31. HHS acknowledges that Section 155.220(o) is a legislative rule and that it did not provide notice or an opportunity for public comment before adopting that rule. HHS instead contends that it satisfied the good-cause exception to the notice-and-comment requirement. *See* Interim Final Rule and Moratorium, 91 Fed. Reg. at 60323-26. First, HHS claimed that there was a need for prompt action, citing actions it had taken "since January 2026" to address "non-compliant agents and brokers," as well as "new system changes and protections against agent and broker fraud" that were "not yet final." *Id.* at 60323. Second, HHS claimed that providing prior public notice and comment would be impracticable. *See id.* at 60324-26. But HHS's reasons there were primarily about the impracticability of giving advance notice of the moratorium that CMS would then impose under the newly adopted rule — not about the impracticability of giving advance notice of the broad new authority that Section 155.220(o) gives to CMS. *See id.*

32. Relying on the new authority Section 155.220(o) provided — and without ever mentioning the document CMS had submitted to OMB (and later withdrew) earlier that month or its cancellation of the August webinars — CMS immediately imposed a moratorium barring

"new" agents and brokers from registering for Plan Year 2027. *See id.* at 60317. The moratorium took effect on September 22, 2026, and lasts until February 1, 2027, unless CMS lifts, extends, or modifies it. *Id*. CMS estimates that "approximately 19,000 new agents and brokers would have registered during" that period. *Id.* at 60325. Those new agents and brokers will be prevented from assisting consumers with Exchange enrollment for the entire open-enrollment period (November 1, 2026 – January 15, 2027).

33. To justify the moratorium, CMS pointed to data that it claims showed that, during Plan Year 2026, new agents and brokers had higher rates of noncompliant practices as compared to returning agents and brokers. *See id.* at 60320-21. These factors include unresolved income-verification issues, enrollments without Social Security numbers, unresolved citizenship or immigration-status verification, unverified special enrollment periods, Medicaid denial attestations, and Medicaid/Children's Health Insurance Program matching. *Id.* at 60321.

34. CMS did not include all the data underlying its claims in the Interim Final Rule and Moratorium. Nor did it cite a source where all that data can be found.

35. But the limited data CMS disclosed does not justify barring approximately 19,000 new agents and brokers from registering for Plan Year 2027. According to CMS, there were "84,012 total registered agents and brokers with active enrollments" in Plan Year 2026. *Id.* at 60321 n.11. Of those more than 84,000 agents and brokers, just "569 agents and brokers . . . received *Notices* of Intent to Terminate Exchange agreements in July and August of 2026." *Id.* at 60321 (emphasis added). CMS says that new agents and brokers — who accounted for about 11 percent of all registered agents and brokers — "account[ed] for approximately 30 percent of the 569" who received termination notices. *Id.* Yet new agents and brokers account for only 11 percent of those who received final termination notices — the *same* as in the total population of

registered agents and brokers. *See id.* at 60322. And less than 2 percent of all new agents and brokers for Plan Year 2026 received termination notices. *See id.* at 60321 & n.11. CMS's own data thus shows that more than 98 percent of new agents and brokers and about 99.5 percent of returning agents and brokers did *not* get termination notices. *See id.* That is no crisis warranting precluding about 19,000 new agents and brokers from registering.

36. CMS's comparisons about the rate of various issues as between new and returning agents and brokers, *see id.* at 60321, likely suffer from a similar defect of ignoring the overwhelming majority of agents and brokers of both types who had no such issues. But CMS did not include the underlying data in the Interim Final Rule and Moratorium. And because HHS bypassed notice-and-comment rulemaking, that data is not in the administrative record.

37. More importantly, CMS's moratorium does not prevent agents and brokers who were "new" in Plan Year 2026 — the very ones whose higher rates of problems CMS uses to justify its moratorium — from registering for Plan Year 2027. All of them are "returning" agents and brokers for purposes of Plan Year 2027. CMS gives no reason to suspect that the approximately 19,000 agents and brokers that it is barring from registration are anything like the subset of the roughly 9,000 now-returning agents and brokers that are the basis for the moratorium.

38. CMS predicts that "the volume of potential returning agents and brokers will provide consumers with adequate access to enrollment assistance." *Id.* at 60322. But HHS simultaneously estimates that the moratorium will block approximately 19,000 new agents and brokers from registering for Plan Year 2027 — more than twice as many new agents and brokers as in Plan Year 2026. *See id.* at 60321 n.11, 60324-25. CMS's predictive judgment is also inconsistent with its 2025 reinstatement of 850 agents and brokers it had suspended for suspected

misconduct, which it did "to better fulfill the agency's statutory and regulatory procedures" (*i.e.*, to enable them to sign people up for health-care plans). December 2025 GAO Report at 17.[12]

**D. The Moratorium Will Irreparably Harm NABIP's Members and the Public**

39. NABIP represents more than 100,000 licensed health insurance agents, brokers, general agents, consultants, and benefits professionals through more than 200 chapters nationwide. Most of NABIP's members are small businesses or individual insurance agents and brokers.

40. NABIP members have spent months of work preparing for the 2027 open enrollment season. They have also spent considerable funds recruiting, hiring, training, and licensing new agents, expecting that those agents would be able to enroll consumers into ACA plans during this year's open enrollment season.

41. That hiring must be complete well in advance of open enrollment because onboarding and training agents and brokers is time-consuming. It is also a significant investment for all parties: agents and brokers spend money and time getting their state licenses before applying, and firms must then extensively train these new agents to serve clients.

42. A firm's new agent training includes not just the mandatory federal training for ACA enrollment, but also insurance-company webinar training, tax training, and additional training on health insurance best practices. With the training moratorium in effect, those investments will go to waste. For small firms that comprise the majority of NABIP's members, that loss of funds can be catastrophic to their business. Without federal training or certifications,

[12] *See Patient Protection and Affordable Care Act: Preliminary Results from Ongoing Review Suggest Fraud Risks in the Advance Premium Tax Credit Persist*, GAO-26-108742 (U.S. Gov't Accountability Off., Dec. 2025), https://www.gao.gov/products/gao-26-108742 ("December 2025 GAO Report").

new agents cannot enroll or serve ACA clients. But the costs that these firms incurred in hiring and employing them continue to mount.

43. NABIP members will also suffer from their new, unexpected staffing shortages. These firms have spent months networking and advertising for business they will not be able to handle. These lost business opportunities amount to significant revenue, and can never be recovered, because a firm's potential clients that are turned away because of staffing shortages are unlikely to ever return to the firm in future years.

44. Although the harm to NABIP currently exists and grows daily, the bulk of NABIP members' harms will likely accrue beginning in December.

45. Although open enrollment begins on November 1, the bulk of enrollments via HealthCare.gov are likely to occur from December 1 through the end of open enrollment in January. For example, in Plan Years 2022 through 2026, at least 60 percent — and in one year about 75 percent — of enrollments via HealthCare.gov occurred during that period.

## CLAIMS FOR RELIEF

### COUNT I
***Violation of the Administrative Procedure Act, 5 U.S.C. § 553***
***Failure To Provide Notice and an Opportunity for Comment***

46. NABIP realleges and incorporates by reference paragraphs 1 through 45.

47. Section 155.220(o) is undisputedly a legislative rule, so HHS was required to provide notice and comment before promulgating it unless an exception applies. *See* 5 U.S.C. § 553(a)-(c). HHS asserts that the good-cause exception — "that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest," *id.* § 553(b) — does. *See* Interim Final Rule and Moratorium, 91 Fed. Reg. at 60323-26. HHS is wrong.

48. "The good-cause inquiry is meticulous and demanding" and courts "narrowly construe and reluctantly countenance the exception." *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d

702, 706 (D.C. Cir. 2014) (cleaned up); *see also N.C. Growers' Ass'n v. United Farm Workers*, 702 F.3d 755, 767 (4th Cir. 2012) ("The circumstances justifying reliance on the good cause exception are rare, and will be accepted only after a reviewing court examines closely the proffered reason for an agency's deviation from public notice and comment.") (cleaned up).

49. Courts have found good cause where the rule addresses an issue involving "imminent[] threat[s] [to] life or physical property." *Sorenson*, 755 F.3d at 706; *see also Jifry v. FAA*, 370 F.3d 1174, 1179-80 (D.C. Cir. 2004) (good cause existed based on "legitimate concern over the threat of further terrorist acts involving aircraft in the aftermath of September 11, 2001"). HHS cites no such threats. Nor do CMS's monetary calculations — which go to the purported benefits of the moratorium, and not of the rule itself — rise to the level of a "fiscal calamity" or "fiscal emergency." *Sorenson*, 755 F.3d at 707.

50. HHS starts by claiming a need for prompt action. *See* Interim Final Rule and Moratorium, 91 Fed. Reg. at 60323. But HHS offers no reason why it did not start earlier — if the authority to impose a moratorium on agent and broker registrations were really a necessary tool in its anti-fraud arsenal. CMS's own actions — canceling the August webinar for new agents and brokers and submitting a still-secret moratorium document to OMB in early September — showed that it had concluded that new agent and broker registration should not occur for Plan Year 2027 well before September 22. The fact that CMS has waited so long that open enrollment for Plan Year 2027 is now around the corner, *see id.* at 60324, does not supply good cause. An agency cannot manufacture good cause through its own delay; "otherwise, an agency unwilling to provide notice or an opportunity to comment could simply wait until the eve of a . . . deadline, then raise up the 'good cause' banner and promulgate rules without following APA procedures."

*NRDC v. NHTSA*, 894 F.3d 95, 114-15 (2d Cir. 2018) (cleaned up); *see also Nat'l Venture Cap. Ass'n v. Duke*, 291 F. Supp. 3d 5, 16 (D.D.C. 2017).

51. HHS next says that CMS finds that "providing notice and an opportunity for public comment before implementing the temporary moratorium would be impracticable," primarily because agents would have rushed to register to avoid the moratorium. Interim Final Rule and Moratorium, 91 Fed. Reg. at 60324. That conflates the promulgation of Section 155.220(o), which authorizes moratoria, with CMS's specific application of that authority to declare this moratorium. Even if CMS could justify imposing a moratorium using the authority in Section 155.220(o) without providing notice and an opportunity for comment,[13] that is not good cause for bypassing notice and comment when promulgating the rule itself. An agent or broker who learns about a *proposed* rule authorizing *possible* future moratoria has no reason to hurry to register in response to the possibility of CMS obtaining such authority. And even on the specific timing here, CMS's rationale also makes no sense. Registration for Plan Year 2026 closed on July 12, 2026. After that date, it was impossible for anyone to register for Plan Year 2026 and thereby become a "returning" agent for Plan Year 2027.

52. CMS's remaining reason — that it allegedly only discovered "the need for the temporary moratorium" recently, Interim Final Rule and Moratorium, 91 Fed. Reg. at 60325 — is also directed to CMS's use of the rule, not HHS's promulgation of it without notice and comment. Here, too, CMS's assertion that it could not have started the process sooner cannot be squared with its unmentioned August webinar cancellation, and the moratorium document it

[13] The new rule claims such authority for all future moratoria: under the rule, HHS (or CMS acting on delegated authority) simply "publish[es] a document in the Federal Register indicating the date the moratorium will take effect, the reasons for imposing the moratorium, and the duration of the moratorium." Interim Final Rule and Moratorium, 91 Fed. Reg. at 60334.

submitted to OMB in early September, both of which show that the decision to bar new agents and brokers for Plan Year 2027 was made before any decision to adopt Section 155.220(o). Again, the agency's own delay cannot create good cause. *See NRDC*, 894 F.3d at 114-15; *Nat'l Venture Cap. Ass'n*, 291 F. Supp. 3d at 16.

53. HHS unlawfully promulgated Section 155.220(o) without following the notice-and-comment procedures the APA requires. The Court should vacate the regulation and, once the regulation is vacated, CMS has no authority to impose the moratorium. The Court should vacate that as well.

**COUNT II**
***Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)***
***Section 155.220(o) Exceeds HHS's Statutory Authority***

54. NABIP realleges and incorporates by reference paragraphs 1 through 45.

55. Agencies are creatures of statute and have only as much authority as Congress gives them. *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). Even if HHS could bypass the notice-and-comment process when promulgating Section 155.220(o), it still must identify a valid source of statutory authority for the regulation. Absent such authority, HHS has acted "not in accordance with law" and "in excess of statutory . . . authority," in violation of the APA. 5 U.S.C. § 706(2)(A), (C).

56. HHS cites three provisions as its source of statutory authority: Sections 1312(e), 1321, and 1313(a)(5)(A). *See* Interim Final Rule and Moratorium, 91 Fed. Reg. at 60317-18 (citing 42 U.S.C. §§ 18032(e), 18041, and 18033(a)(5)(A)). But the first authorizes HHS to "establish procedures under which a State may allow agents or brokers" to enroll individuals in plans through an Exchange. 42 U.S.C. § 18032(e). A moratorium limits the ability to enroll individuals — that is the opposite of procedures that *allow* enrollment. The second authorizes

HHS to establish rules for the operation of Exchanges. *See id.* § 18041. That section never mentions agents, brokers, or registration; it offers no authority for Section 155.220(o).

57. The third directs the Secretary to "implement any measure or procedure that — (A) . . . is appropriate to reduce fraud and abuse . . . ; *and* (B) the Secretary has authority to implement under this title or any other Act." 42 U.S.C. § 18033(a)(5) (emphasis added) (footnote omitted). HHS focuses on (A), but ignores (B), which makes clear that (A) is not a free-standing grant of authority. Instead, it is a directive to use authority granted elsewhere to address fraud and abuse. HHS cites no other source of authority.

58. In addition, the rest of Section 1313 makes clear that Section 1313(a)(5)(A) does not authorize any actions as to agents and brokers, much less a moratorium. The rest of subsection (a) — entitled "Accounting for Expenditures" — addresses accurate Exchange books and records, investigations and audits, penalties against Exchanges for "serious misconduct," and the applicability of the False Claims Act on payments made. *Id.* § 18033(a). And subsection (b) directs the Comptroller General to "conduct an ongoing study of Exchange activities and the enrollees in qualified health plans offered through Exchanges." *Id.* § 18033(b). None of these provisions mentions agents, brokers, or registration.

59. Finally, the text of Section 155.220(o) compounds HHS's over-reading of Section 1313(a)(5)(A) by failing to set any meaningful limits on when CMS can impose a moratorium or for how long a moratorium may last before it ceases to be "temporary."

60. For these reasons as well, HHS unlawfully promulgated Section 155.220(o), which exceeds its statutory authority. The Court should vacate the regulation and, once the regulation is vacated, CMS has no authority to impose the moratorium. The Court should vacate that as well.

**COUNT III**

***Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (E)***
***CMS Arbitrarily and Capriciously Imposed a Moratorium, Without Substantial Evidence Supporting One***

61. NABIP realleges and incorporates by reference paragraphs 1 through 45.

62. Even if HHS lawfully promulgated Section 155.220(o), CMS's use of the authority that provision confers to impose a moratorium is unlawful if it is "arbitrary, capricious," or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E). CMS's reasons for imposing a moratorium fail that test.

63. CMS claims that the moratorium is justified because data from Plan Year 2026 shows new agents and brokers "disproportionately represent" those engaged in noncompliance as compared to returning agents and brokers. Interim Final Rule and Moratorium, 91 Fed. Reg. at 60320. But the limited data CMS disclosed reveals that new agents and brokers make up 11 percent of those with Plan Year 2026 registrations that it has terminated — yet new agents and brokers also make up 11 percent of the total Plan Year 2026 registrants. *See id.* at 60321 & n.11, 60322. While new agents and brokers made up a higher percentage of those receiving notices of intent to terminate (the start of the administrative process), less than 2 percent of new agents and brokers received such notices. *See id.* at 60321 & n.11. CMS also admits that "data from the beginning of 2026 already demonstrates a substantial decrease" in complaints about unauthorized enrollments. *Id.* at 60319.

64. CMS also never explains why targeted enforcement against agents or brokers — new or returning — who do not comply with the rules is insufficient. CMS touts that it "has been taking proactive steps using existing enforcement authorities to terminate Exchange agreements and prohibit registration of non-compliant agents and brokers," alongside parallel Department of Justice enforcement. *Id.* at 60319-20. Those targeted actions coincide with the very decline in

complaints that CMS acknowledges. *See id.* at 60319. CMS offers nothing more than its assertion that "[a] retrospective approach . . . is insufficient" and that "additional measures are needed." *Id.* at 60320.

65. CMS's action is internally inconsistent. CMS cites no data showing that new agents and brokers as a class are regularly worse than returning agents and brokers. That is not surprising as agents and brokers are "new" only in the sense they did not register for Plan Year 2026 — they could have registered in prior years, or been selling insurance in States that operate their own exchanges or other kinds of insurance for years. Yet CMS's moratorium allows all the "new" agents from Plan Year 2026 to register for Plan Year 2027, while prohibiting "approximately 19,000" different people from registering for Plan Year 2027, *id.* at 60325 — without any information about those people.

66. Finally, CMS's "belie[f]" that its moratorium will not prevent consumers from getting help from agents and brokers, *id.* at 60322, cannot be squared with the data it offered and CMS's recent actions. First, CMS expects the moratorium to prevent "approximately 19,000 new agents and brokers" from registering, *id.* at 60325, which is more than *2.7 times* the number of new agents and brokers who had at least one active enrollment during the Plan Year 2026 open enrollment period, *see id.* at 60321 n.11. On top of that, in 2025, CMS reinstated 850 agents and brokers that it had *suspended* for suspected misconduct "to better fulfill the agency's statutory and regulatory procedures." December 2025 GAO Report at 17. For both reasons, CMS does not justify its belief that excluding 19,000 agents and brokers — none of whom is suspected of misconduct — will mean that consumers can still get the help they need in navigating the Exchanges.

67. For these reasons, even if Section 155.220(o) were lawful, the moratorium CMS imposed is arbitrary and capricious and unsupported by substantial evidence. The Court should vacate it.

**COUNT IV**
***Violation of the Administrative Procedure Act, 5 U.S.C. § 706(1)***
***CMS Unlawfully Withheld and Unreasonably Delayed New Agent Training***

68. NABIP realleges and incorporates by reference paragraphs 1 through 45.

69. The APA authorizes the Court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

70. CMS is required to hold training annually for new agents and brokers. Exercising authority Congress conferred, *see* 42 U.S.C. § 18032(e), the Secretary promulgated regulations requiring state-licensed agents and brokers to complete federally approved training before enrolling individuals on the Exchanges, *see* 45 C.F.R. § 155.220(d). CMS has recognized its obligation to conduct that training, which is necessary for "agents and brokers . . . to meet Exchange requirements," stating that it would "continue to offer free [Exchange] training to agents and brokers annually through CMS' [training platform]." Plan Year 2027 Rule, 91 Fed. Reg. at 29601. Conducting new agent training is thus a discrete agency action that CMS is required to take.

71. Despite that, CMS refused to start Plan Year 2027 training for new agents and brokers before issuing the moratorium. CMS also unreasonably delayed the start of training, which began in July or August in 11 of the 13 years the ACA has been in operation. Instead, CMS scheduled, then canceled without explanation, a kickoff webinar for new agents in August. CMS then submitted a moratorium document to OMB in early September, which it then withdrew.

72. CMS's actions, culminating in the unlawful promulgation of Section 155.220(o) and the unlawful moratorium, reflect a deliberate choice to keep new agents and brokers out of the Exchanges throughout open enrollment.

73. In addition to vacating Section 155.220(o) and the moratorium, the Court should compel CMS to conduct new agent and broker training immediately, so those agents and brokers can be ready to assist consumers with navigating the Exchanges once open enrollment begins.

**PRAYER FOR RELIEF**

WHEREFORE, NABIP respectfully requests that the Court grant the following relief:

1. Declare that Section 155.220(o) and the moratorium that CMS imposed using the authority in that regulation are unlawful under the APA, vacate and set aside both the regulation and the moratorium, and enjoin Defendants from enforcing them;
2. Issue a writ of mandamus, preliminary injunction, and permanent injunction commanding CMS to make training available for new agents and brokers immediately, so that they can complete the training in time to participate in the Exchanges when open enrollment begins on November 1, 2026, or, at a minimum, early enough to allow them to sufficiently participate in enrolling individuals in the open enrollment period, no later than December 2026; and
3. Such further relief as the Court deems just and equitable.

Dated: October 15, 2026

Respectfully submitted,

*<u>/s/ Joshua D. Branson</u>*
Joshua D. Branson (Bar No. 29536)
Scott H. Angstreich (*pro hac vice* forthcoming)
Kenneth M. Fetterman (*pro hac vice* forthcoming)
Eliana Margo Pfeffer (*pro hac vice* forthcoming)
Christie M. Lawrence (*pro hac vice* forthcoming)
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
1615 M Street N.W., Suite 400
Washington, DC 20036
Tel.: (202) 326-7900
Fax: (202) 326-7999
jbranson@kellogghansen.com
sangstreich@kellogghansen.com
kfetterman@kellogghansen.com
epfeffer@kellogghansen.com
clawrence@kellogghansen.com

*Counsel for Plaintiff National Association of Benefits and Insurance Professionals*