**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

NATIONAL ASSOCIATION OF BENEFITS AND INSURANCE PROFESSIONALS,

*Plaintiff*,

v.

ROBERT F. KENNEDY, JR., in his official capacity as SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, and DR. MEHMET OZ, in his official capacity as ADMINISTRATOR OF THE CENTERS FOR MEDICARE & MEDICAID SERVICES, *et al.*,

*Defendants*.

No. 1:26-cv-04311-SAG

Hearing on TRO Set for Wednesday, October 21 at 2 PM

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 3
BACKGROUND ........................................................................................................ 4
I. The Affordable Care Act ........................................................................................ 4
II. Agent and Broker Participation in the Federally-Facilitated Exchanges ........................... 6
III. New Agent/Broker Program Integrity Concerns ........................................................ 7
IV. The Temporary Moratorium ................................................................................ 8
V. This Litigation ........................................................................................................ 9
LEGAL STANDARD ................................................................................................ 9
ARGUMENT ........................................................................................................ 10
I. Plaintiff Fails To Show Irreparable Harm ............................................................ 10
II. Plaintiff is Unlikely to Prevail on the Merits of Its Claim ........................................ 14
A. CMS Complied With The APA's Procedural Requirements ...................................... 14
B. CMS Acted Within Its Statutory Authority ............................................................ 19
C. CMS Did Not Act In An Arbitrary Or Capricious Fashion In Issuing The IFR ........... 26
D. Plaintiff's Other Clams Lack Merit. ........................................................................ 29
III. The Equities and Public Interest Weigh Against Emergency Relief ............................ 30
IV. Any Relief Should Be Appropriately Narrow And Limited To The Parties .................. 31
CONCLUSION ........................................................................................................ 32

## INTRODUCTION

Protecting consumers and safeguarding the operation of the Affordable Care Act's health care exchanges are central to the responsibilities of the Centers or Medicare & Medicaid Services ("CMS") as administrator of these exchanges. On September 23, 2026, the Centers for Medicare & Medicaid Services instituted a temporary program integrity measure to address fraud, waste, and abuse in these systems. *Patient Protection and Affordable Care Act; Temporary Moratoria on Certain Agent and Broker Registration to Participate in the Exchanges*, 91 Fed. Reg. 60,317 (Sept. 23, 2026). As CMS explained, unauthorized enrollments, unauthorized plan switching, and other noncompliant activity by some agents and brokers threaten both consumers and the integrity of the exchanges, disrupting consumers' health coverage and access to care and resulting in hundreds of millions of dollars in improper federal expenditures.

Faced with these risks to consumers and the federal fisc, CMS determined that its existing enforcement tools were not sufficient because they generally operate only after an agent or broker has registered and begun conducting transactions—and thus after harm may already have occurred. *Id.* at 60,320. CMS took a temporary, prospective approach to this problem: it paused new agent and broker registrations while strengthening program-integrity safeguards intended to prevent unauthorized and noncompliant activity before it can occur. *Id.* at 60,320–21, 60,324–25. That moratorium applies only to agents and brokers who did not have Plan Year 2026 exchange agreements and is scheduled to end on February 1, 2027. *Id.* at 60,317–18.

Just over three weeks after the moratorium went into effect, Plaintiff National Association of Benefits and Insurance Professionals ("NABIP"), an association representing insurance agents and brokers, filed this civil suit to challenge the temporary moratorium. They sought emergency

relief in conjunction with their motion, including a temporary restraining order.[1] The Court should deny the relief sought. NABIP's asserted injuries are principally financial ones, and their submission fails to demonstrate that these financial injuries constitute irreparable harm requiring issuance of a temporary restraining order. These assertions of harm are further belied by NABIP's delay in seeking emergency relief. Nor has NABIP shown a strong likelihood of success on the merits. They contend that CMS lacked statutory authority to impose the moratorium, improperly proceeded without advance notice and comment, acted arbitrarily and capriciously, and unlawfully withheld required training. But CMS acted within its statutory authority, reasonably explained the basis for the temporary measure it selected, and reasonably concluded that advance notice would undermine the purpose of the moratorium by effectively providing a window during which the very conduct the rule is designed to prevent could be undertaken with full knowledge the opportunity to do so was closing.

For these reasons, the Court should deny Plaintiffs' motion. A proposed order is attached.

## BACKGROUND

### I. The Affordable Care Act

Enacted in 2010, the ACA adopts a number of coordinated reforms to expand health insurance coverage and "to make insurance more affordable." *King v. Burwell*, 576 U.S. 473, 478-79 (2015). As a key component of addressing the affordability of coverage, the ACA provides subsidies to eligible enrollees in the form of premium tax credits. *See* 26 U.S.C. § 36B. Enrollees may obtain their premium tax credits when they file their annual federal income-tax returns, but

[1] The Court's order set a "TRO HEARING" regarding "[3] Plaintiffs Motion for a Temporary Restraining Order" for this Wednesday. Defendants therefore submit this brief in opposition solely to Plaintiffs' request for a temporary restraining order, pursuant to Fed. R. Civ. P. 65(b). Defendant respectfully requests the full allotment of time in which to respond to the motion for preliminary injunction.

they also have the option of receiving premium tax credits in advance, paid directly to their insurance providers to offset premium costs. *See* 42 U.S.C. § 18082.

The ACA also provides for the creation of "Exchanges"— marketplaces generally operated on a State-by-State basis on which consumers can compare and purchase private health insurance that meets certain standards. 42 U.S.C. § 18031(d). Some Exchanges are operated by individual States. *Id.* § 18041(b). Other Exchanges are operated by the federal government within the States. *Id.* § 18041(c)(1). The ACA provides for "annual open enrollment periods, as determined by the Secretary" during which any eligible person may enroll in, change, or disenroll from a health insurance plan. 42 U.S.C. § 18031(c)(6)(B).

The ACA directs the Secretary of Health and Human Services to establish procedures under which States may permit insurance agents and brokers to enroll individuals and employers in qualified health plans offered through an Exchange and to assist individuals in applying for advance payments of the premium tax credit and cost-sharing reductions. 42 U.S.C. § 18032(e). Congress also charged the Secretary with establishing standards governing the operation of Exchanges, with establishing and operating a federal Exchange in States that do not establish an Exchange satisfying federal requirements, and with establishing such other requirements as the Secretary determines appropriate. *Id*. § 18041(a), (c) – (d), 18033(a)(5).

Congress expressly contemplated and granted broad authority to the Secretary to establish measures and procedures to reduce fraud and abuse in the administration of the Exchange provisions of the Affordable Care Act. 42 U.S.C. § 18033(a)(5). CMS has implemented those responsibilities in part through 45 C.F.R. § 155.220, which establishes requirements governing agents and brokers that assist consumers enrolling in qualified health plans through Federally-facilitated Exchanges and State-based Exchanges using the federal platform (collectively, "FFE"

or “FFEs”). Those requirements address, among other things, registration, training, execution of Exchange agreements, access to Exchange systems, protection of personally identifiable information, and standards of conduct.

## II. Agent and Broker Participation in the Federally-Facilitated Exchanges

Agents and brokers must register with CMS for each plan year before they may assist consumers with applying for or enrolling in qualified health plans through the Federally-Facilitated Exchanges. The registration process generally includes creating a CMS account, completing identity proofing, establishing a registration profile, completing required training, and executing the applicable Exchange agreements with CMS. *See* 45 C.F.R. § 155.220(d). Those agreements generally remain in effect for one plan year. Through that process, registered agents and brokers obtain access to federal systems and information that enable them to assist Exchange consumers with applications, eligibility determinations, enrollment transactions, and applications for federal financial assistance. *See* 45 C.F.R. § 155.220(a). In the course of providing that assistance, they also obtain access to consumers’ personally identifiable information and other personally identifiable and sensitive data.

Agents and brokers directly participate in Exchange enrollment. During the most recent open enrollment period, consumers purchased more than 75 percent of plans through the FFEs with agent or broker assistance. Compl. ¶ 18. They are generally compensated by issuers on a per-member-per-month basis for active enrollments they facilitate. For Plan Year 2026, 84,012 registered agents and brokers had at least one active enrollment through the Federally-facilitated Exchanges. 91 Fed. Reg. at 60,323.

## III. New Agent/Broker Program Integrity Concerns

CMS's analysis of Plan Year 2026 enrollment and enforcement data identified a particular vulnerability associated with newly registered agents and brokers. Agents and brokers who registered for the first time in Plan Year 2026 represented approximately 11 percent of all registered agents and brokers with an active enrollment, but approximately 30 percent of the 569 agents and brokers who received Notices of Intent to Terminate in July and August based on potential noncompliance or statistically implausible rates of applications without identifying applicant information, such as a Social Security number. 91 Fed. Reg. at 60,321.

CMS also identified elevated rates among newly registered agents and brokers across several enrollment indicators associated with unauthorized or noncompliant activity. Compared with agents and brokers registered before Plan Year 2026, newly registered agents and brokers had 2.8 times the rate of enrollments with unresolved income-verification data-matching issues; 2.7 times the rate of enrollments without Social Security numbers; 2.6 times the rate of enrollments with unresolved citizenship or immigration-status verification issues; 1.6 times the rate of enrollments using special enrollment periods not subject to verification; and 1.4 times the rates of both Medicaid-denial attestations and enrollments identified through Medicaid/CHIP periodic data matching. 91 Fed. Reg. at 60,321.

CMS explained that these indicators involve points in the application process at which information may be self-attested or unverified and therefore can provide opportunities to submit or alter enrollment information without the consumer's knowledge or consent. CMS tracks those patterns because they correlate with confirmed unauthorized enrollment schemes identified through Exchange complaint and audit processes adopted by CMS.

CMS also concluded that its existing individualized enforcement mechanisms did not fully address the vulnerability presented by new entrants. Suspension and termination operate after an agent or broker has registered and begun assisting consumers with Exchange applications and enrollments. Thus, although those authorities permit CMS to respond to identified misconduct or potential noncompliance, they are post-hoc steps taken after the consumer and program harm have occurred. As explained in the IFC, an agent or broker terminated in an earlier year may be able to establish a new corporate entity and seek to register again as a new agent or broker. 91 Fed. Reg. at 60,324.

CMS explained that its more recent experience therefore identified a vulnerability not adequately addressed by its prior measures: newly entering agents and brokers can obtain access to Exchange enrollment functionality before CMS's monitoring and post-registration enforcement mechanisms identify and respond to problematic conduct. CMS stated that the Plan Year 2026 data "materially changed CMS' understanding of both the source of the remaining risk and the adequacy of existing safeguards." 91 Fed. Reg. at 60,325.

## IV. The Temporary Moratorium

On September 22, 2026, CMS issued the interim final rule challenged here, adding 45 C.F.R. § 155.220(o), which authorizes CMS to temporarily pause certain agent and broker registrations when it determines that agent or broker conduct poses an unacceptable risk to Exchange eligibility determinations, operations, applicants or enrollees, or information-technology systems.

Pursuant to that authority, CMS imposed a temporary moratorium on Plan Year 2027 registration for agents and brokers that did not have Plan Year 2026 Exchange agreements. CMS explained that the moratorium will give it additional time to implement program-integrity controls,

including enhanced identity proofing and authentication, up-front requirements of verification of applicant Social Security numbers or immigration-document numbers for applications that involve agents and brokers, additional controls on agent assistance, and electronic consumer-authorization requirement. The moratorium is scheduled to end on February 1, 2027, unless CMS lifts it earlier or modifies or extends it through subsequent Federal Register notice announcements.

### V. This Litigation

NABIP is a trade association representing more than 100,000 licensed agents, brokers, and benefits professionals in the United States. It filed this action on October 15, 2026, and sought emergency relief the same day. ECF No. 1, 3. It asks the Court to enjoin CMS from implementing or enforcing 45 C.F.R. § 155.220(o) and the Plan Year 2027 moratorium. It also seeks affirmative relief requiring CMS to conduct new-agent training and permit new agents and brokers to register in time to participate in Plan Year 2027 open enrollment.

## LEGAL STANDARD

A party seeking a TRO must establish: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) that the injunction serves the public interest. *Pevia v. Hogan*, 443 F. Supp. 3d 612, 643 (D. Md. 2020) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). “[A]ll four requirements must be satisfied.” *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346 (4th Cir. 2009), *judgment vacated on other grounds*, 559 U.S. 1089 (2010). “Federal decisions have uniformly characterized the grant of interim relief as an extraordinary remedy involving the exercise of a very far-reaching power.” *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1992) (quotations omitted); *Robinson v. Wexford Health*, No. ELH-18-2360, 2018 WL 4961658, at *2 (D. Md. Oct. 15, 2018). The movant’s burden is

therefore "exceedingly high." *Mahmoud v. McKnight*, 102 F.4th 191, 203 (4th Cir. 2024), *rev'd on other grounds sub. nom Mahmoud v. Taylor*, 606 U.S. 522 (2026). And as explained below, Plaintiffs fail to meet that standard here.

**ARGUMENT**

A motion for a temporary restraining order "requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way. The danger of a mistake in this setting is substantial." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 284 (4th Cir. 2002) (cleaned up). That is why such relief is extraordinary and requires a strong showing from the plaintiff on each factor. No such showing has been made here. The purported financial injuries of Plaintiffs' members are quintessentially not the type of injury that justifies injunctive relief, and Plaintiffs have failed to show that their potential financial injuries are of such a magnitude that the Court cannot even allow for a motion for a preliminary injunction to be briefed on this Court's standard timelines before the moratorium is enjoined. Plaintiffs also cannot carry their burden of persuasion on the questions of whether Defendants complied with the APA in declaring the moratorium, or on whether the balance of equities favors them. As explained below, the Court should deny the motion.

**I. Plaintiff Fails To Show Irreparable Harm**

Because it seeks preliminary relief, NABIP has the burden of showing it is "likely to suffer irreparable harm in the absence of" such relief. *Pierce v. N.C. Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024). It is not enough to show some "possibility of irreparable injury." *Nken v. Holder*, 556 U.S. 418, 434 (2009). Rather, NABIP "must make a 'clear showing' that [it] will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019); *see Ass'n of Am. Publishers v. Frosh*, 586 F. Supp. 3d 379, 393 (D. Md. 2022) ("The harm . . . must be more than a mere possibility; it must

be likely.”). And preliminary relief is warranted only if NABIP is likely to suffer the asserted harm “before a decision on the merits can be rendered.” *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 726 (D. Md. 2018) (quoting *Winter*, 555 U.S. at 22); *see Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). Moreover, “[s]ince an application for preliminary injunction is based upon an urgent need for the protection of a Plaintiff's rights, a long delay in seeking relief indicates that speedy action is not required.” *See Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) (cleaned up).

NABIP has not made that showing. Its asserted injuries are principally financial: lost commissions and revenue, sunk hiring and advertising costs, and potential loss of customers. NABIP argues that those injuries are necessarily irreparable because the APA does not permit recovery of money damages. Pl.’s Br., ECF No. 3, at 34. But the unavailability of damages does not automatically transform every economic loss into irreparable injury. Otherwise, “[p]rospective injunctive relief would often cease to be an ‘extraordinary remedy’ in cases involving government defendants” protected by sovereign immunity. *Otsuka Pharm. Co. v. Burwell*, No. GJH-15-852, 2015 WL 1962240, at *11 (D. Md. Apr. 29, 2015) (quoting *N. Air Cargo v. USPS*, 756 F. Supp. 2d 116, 125 n.6 (D.D.C. 2010)). Unrecoverable economic losses *may* constitute irreparable harm, *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P’ship*, 918 F.3d 353, 366 (4th Cir. 2019), but NABIP must still make the required clear showing that the asserted injury is likely, actual, and imminent. The declarations it submitted fail to make this showing.

The first declaration concerns Good to Great Holdings, LLC d/b/a Financial Partners. Fristoe Decl., ECF No. 3-2 ¶ 1. Financial Partners employs eight agents, only three of whom are affected by the moratorium; its five other agents remain available to enroll consumers during Plan Year 2027. *Id.* ¶¶ 8, 13. Fristoe states that the firm has incurred hiring expenses and continuing

employment costs, *id.* ¶ 15, and predicts decreased revenue during open enrollment. *Id.* ¶ 16. But the declaration does not state that Financial Partners will cease operations or become insolvent. At most, it states that the firm "may have to fire three agents" if the moratorium continues. *Id.* ¶ 17. That contingent prediction does not establish that Financial Partners itself faces an imminent threat to its continued operation.

The second declaration is even less probative of irreparable injury to a NABIP member. Chamberlain, not her parents' company, Luft Insurance Agency, is the identified NABIP member. Chamberlain Decl., ECF No. 3-3 ¶ 2. Chamberlain is a full-time salaried employee, and Luft has committed to continue paying her $2,500 monthly salary for twelve months notwithstanding the moratorium. *Id.* ¶¶ 7, 11. She separately projects approximately $96,000 in lost commissions, but provides no factual basis for that projection: no expected number of clients, anticipated enrollments, historical commissions, or other information from which the Court could determine that the projected loss is likely rather than speculative. *Id.* ¶ 14.

Chamberlain also predicts harm to Luft, but those assertions do not cure the deficiency. She states that Luft historically has enjoyed high retention but predicts that this "will likely not be the case going forward" if it cannot add licensed staff. *Id.* ¶ 12. She further predicts that staffing shortages will prevent Luft from growing and cause it to turn away customers, while acknowledging that the resulting revenue loss "is hard to calculate." *Id.* ¶ 13. These predictions depend on uncertain future events and provide no concrete basis for determining either their likelihood or magnitude. And Chamberlain does not state that Luft itself is a NABIP member. NABIP cannot satisfy its burden through such predictions and speculation. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013) (threatened injury must be "certainly impending"). Nor does the magnitude of an asserted economic loss, standing alone, establish irreparable injury. *See Wis.*

*Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("[E]conomic loss does not, in and of itself, constitute irreparable harm."); *EMILY's List v. FEC*, 362 F. Supp. 2d 43, 52 (D.D.C. 2005). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended" do not suffice. *Di Biase*, 872 F.3d at 230.

That is particularly true where the asserted losses do not threaten the viability of the business. Courts evaluating irretrievable monetary losses "typically find irreparable harm only where the monetary losses are so severe that they threaten the very existence of the company." *Otsuka Pharm.*, 2015 WL 1962240, at *11; *see Harbor Side Grill, LLC v. City of Annapolis*, No. 26-cv-0714-RDB, 2026 WL 636867, at *16 (D. Md. Mar. 6, 2026) (quoting *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 499 (D. Md. 2020)) (recognizing irreparable harm where "monetary losses are so severe as to threaten insolvency"). Yet neither declarant asserts that the moratorium threatens the continued existence or solvency of any NABIP member.

Nor can NABIP rely on harms allegedly suffered by persons or businesses that it has not shown are members. The injury supporting emergency relief must affect the plaintiff "in a personal and individual way." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024); *see New Mexico v. Musk*, 769 F. Supp. 3d 1, 7 (D.D.C. 2025) ("[H]arm that might befall unnamed third parties does not satisfy the irreparable harm requirement in the context of emergency injunctive relief."). Thus, Chamberlain's speculation about Luft's future business losses cannot substitute for proof of likely irreparable injury to Chamberlain herself absent evidence establishing that Luft is also a NABIP member.

The weakness of NABIP's showing is underscored by its delay in seeking this relief. Delay in seeking relief belies the notion that the harm is of such a character and magnitude that a TRO is required. *See Quince Orchard*, 872 F.2d at 80. There are no bright-line rules as to how soon a

plaintiff must seek such relief, so context matters. Here, NABIP's assertion that the economic consequences of the moratorium are of such a character that the Court must act within days to enjoin it are belied by the weeks it took to prepare and file its motion for emergency relief. The clear showing of likely, actual, and imminent irreparable injury necessary for such relief is missing here, and the Court should accordingly deny Plaintiff's motion.

## II. Plaintiff is Unlikely to Prevail on the Merits of Its Claim

### A. CMS Complied With The APA's Procedural Requirements

#### 1. CMS Had Good Cause to Issue the Regulation Before Completing Notice and Comment Rulemaking

The APA permits an agency to dispense with advance notice and comment when it finds that those procedures would be "impracticable, unnecessary, or contrary to the public interest" and explains such finding in the rule. 5 U.S.C. § 553(b)(B). The exception applies in circumstances where prior notice "could result in serious harm," *N.C. Growers' Ass'n v. United Farm Workers*, 702 F.3d 755, 766–67 (4th Cir. 2012); *Jifry v. F.A.A.*, 370 F.3d 1174, 1179 (D.C. Cir. 2004) (approving use of an IFR), or "'the interest of the public would be defeated by any requirement of advance notice,' as when announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent." *Utility Solid Waste Activities Grp v. E.P.A.*, 236 F.3d 749, 755 (D.C. Circ. 2001) (quoting Attorney General's Manual on the Administrative Procedure Act ("AG Manual"), § 4(b) at 31 (1947)). CMS satisfied that standard by expressly invoking both impracticability and the public interest devoting several pages of the IFC to explaining why advance notice and comment could not practicably precede the rule. 91 Fed. Reg. 60,317, 60,323–26 (Sept. 23, 2026). That explanation demonstrates why prior notice of the moratorium would have further enabled the problems the moratorium seeks to address, one of the axiomatic use cases for an IFC.

Although CMS had previously addressed unauthorized enrollment through targeted monitoring and enforcement, suspension and termination of noncompliant agents, system changes, and other safeguards, in the IFC it explained that the need for a moratorium became apparent only shortly before Plan Year 2027 open enrollment. *Id.* at 60,325. While CMS's post-hoc program integrity measures produced meaningful improvements and initially supported CMS's decision to continue targeted interventions rather than restrict new participation, *Id.,* CMS explained that more recent Plan Year 2026 enrollment and enforcement data revealed a remaining vulnerability: newly registered agents and brokers could obtain access to Exchange enrollment functionality before CMS's monitoring and post-registration enforcement mechanisms could detect problematic conduct. CMS explained that this information "materially changed CMS' understanding of both the source of the remaining risk and the adequacy of existing safeguards." *Id.* Only then did CMS conclude that a temporary pause on new registrations was necessary while it completed additional preventive controls. *Id.* at 60,325–26.

That chronology distinguishes this case from one in which an agency simply waits until an approaching deadline and then invokes its own delay as good cause. The IFC did not rely merely on the November 1 start of open enrollment. It also identified recent Plan Year 2026 data that changed CMS's assessment of the problem, additional safeguards that were not yet fully operational, and a resulting "time-limited gap" in program-integrity protections immediately before the period in which enrollment activity would increase substantially. *Id.* at 60,325. Requiring CMS to complete notice and comment before acting would have left that identified vulnerability unaddressed during the upcoming open-enrollment period. *Id.* at 60,324–25.

CMS reasonably determined that advance notice would not merely delay the moratorium but affirmatively undermine it. *Id.* at 60,324. Registration can be completed in fewer than 30

days, and historical data show a surge in new registrations between the opening of annual training and the beginning of open enrollment. *Id.* CMS estimated that, absent the moratorium, approximately 19,000 new agents and brokers would register during the period covered by the pause. *Id.* at 60,324–25. Announcing a proposed moratorium before it could take effect would therefore give bad actors an incentive to quickly complete registration and rush to submit enrollment transactions, leaving consumers and Exchanges at risk. CMS explained that, because the moratorium only operates prospectively, it could not reach registrations that had already been completed before its effective date. *Id.* at 60,325. CMS thus reasonably concluded that ordinary procedures would expand the very population whose entry CMS sought temporarily to pause before enhanced safeguards became operational.

Although exceptions from notice and comment rulemaking are rare, this case illustrates why the APA provides for them. The 1947 Attorney General's manual on the APA recognized that the "public interest" exception of § 553(b)(B) was provided to adapt to situations in which "advance notice of . . . [a] rule would tend to defeat [its] purpose." AG Manual at 31. Courts have consistently recognized this formulation of the exception. *See N.C. Growers' Ass'n*, 702 F.3d at 766 (explaining that the public-interest prong applies where advance notice would defeat the public interest); *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 95 (D.C. Cir. 2012) (recognizing good cause where ordinary procedures would themselves harm the public interest); *Utility Solid Waste*, 236 F.3d at 755 (interpreting the "public interest" standard by reference to the AG Manual). Here, advance notice would have created a window to obtain access to Exchange systems before CMS completed the controls designed to address the newly identified entry-point vulnerability. The APA does not require an agency to engage in notice and comment rulemaking when that process would undermine the very purpose of the agency's action.

NABIP's contention that CMS could have proposed the general moratorium authority earlier does not alter the analysis. *See* Pl.'s Mem. 11-12. The IFC explains that CMS did not previously conclude that a moratorium was necessary because the information then available did not establish that temporarily preventing new registrants was warranted. 91 Fed. Reg. at 60,325. The same recent evidence that demonstrated the need for the moratorium also demonstrated the need for a regulatory mechanism permitting CMS to impose that temporary pause. Once CMS reached that conclusion, separating the rule establishing the authority from the immediate adoption of a temporary moratorium would not have solved the notice problem: advance publication of a proposed authority to pause registrations for certain agents and brokers would have alerted bad actors to the impending restriction and created the same incentives to quickly register and rush to submit enrollment transactions before it could take effect.

CMS did not rely merely on generalized concerns about fraud or the approach of an administrative deadline. It identified recent evidence revealing a previously inadequately addressed vulnerability, explained why waiting through notice and comment would expose consumers and the Exchanges to that risk during open enrollment, and further explained why advance notice would facilitate the very entry the temporary rule was designed to pause. Those contemporaneous findings satisfy § 553(b)(B).

Finally, CMS did not dispense with public participation altogether. It issued the rule on an interim basis and solicited comments on all aspects of the rule. *Id.* at 60,317. CMS therefore limited its departure from normal procedure to only what the circumstances required, committing to considering comments in deciding whether the regulation should be retained, modified, or rescinded. *Id.* at 60,323.

Nor does the fact that CMS took time to evaluate the emerging problem make the resulting need for prompt action self-created. CMS was not required to impose a moratorium as soon as it encountered evidence suggesting heightened risk among new registrants. Before imposing the temporary program integrity measure, CMS reasonably took time to assess recent enrollment and enforcement data, evaluate the effectiveness of its existing post-hoc measures, and consider whether a broader prospective approach was necessary and could be appropriately tailored. Indeed, CMS explained that it had previously declined to impose a moratorium because the information then available did not establish that such a measure was necessary or appropriately tailored. 91 Fed. Reg. at 60,325. Once more recent data changed that assessment, CMS acted before the beginning of Plan Year 2027 open enrollment.

**2. The IFC Is Not A Legislative Rule**

Additionally, Defendants did not have to comply with the requirements of § 553 for another reason: the IFC is not a "substantive rule" that requires such procedures. Unlike substantive, or legislative, rules, interpretative rules and general statements of policy are not required to go through notice and comment rulemaking. 5 U.S.C. § 553(b)(3)(A). "An agency policy statement does not seek to impose or elaborate or interpret a legal norm. It merely represents an agency position with respect to how it will treat—typically enforce—the governing legal norm. By issuing a policy statement, an agency simply lets the public know its current enforcement or adjudicatory approach." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 93–94 (D.C. Cir. 1997). The moratorium is just such a statement of policy. Rather than binding itself to some legal rule or interpretation of legal authorities, the agency is employing the statutory authority it has long possessed to regulate the Exchanges (as explained below) by instituting a time-limited moratorium on registration for agents and brokers. This moratorium "does not affect" any underlying "legal norm," and "simply lets the public know" the agency's "current enforcement . . . approach." *Id.* at 94. Notice and

comment was not required for Defendants to make this necessary enforcement measure legally effective.

**B. CMS Acted Within Its Statutory Authority**

Under the APA, a court must set aside agency action found to be "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). Following *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), although courts exercise independent judgment in determining the best reading of the statute rather than deferring automatically to the agency's interpretation, “the statute's meaning may well be that the agency is authorized to exercise a degree of discretion.” *Loper Bright*, 603 U.S. 369, 394 (2024). *Loper Bright* does not strip an agency's interpretation of persuasive weight, as authoritative interpretations of statutes are still entitled to deference under *Skidmore v. Swift & Co*., 323 U.S. 134, 140 (1944). *Loper Bright*, 603 U.S. at 388–89. The relevant legal question, therefore, is whether the authority to impose a moratorium falls within CMS’s congressionally given authority to regulate the ACA exchanges. The answer to that question is a resounding yes.

Congress expressly directed the Secretary to “establish procedures” under which States may allow agents and brokers to enroll individuals and employers in qualified health plans through an Exchange and to assist individuals in applying for premium tax credits and cost-sharing reductions. 42 U.S.C. § 18032(e). Congress separately directed the Secretary to “issue regulations setting standards” governing the “establishment and operation of Exchanges” and, where a State does not establish an adequate Exchange, to establish and operate the Exchange himself. *Id*. § 18041(a), (c), (d), § 18033(a); *see also Batterton v. Francis*, 432 U.S. 416, 428 (1977) (concluding statute that directed states to determine whether a parent was “unemployed” “in accordance with standards prescribed by the Secretary” gave “the Secretary, rather than to the courts, the primary responsibility for interpreting the statutory term”) (cited in *Loper Bright*, 603 U.S. at 394).

In assessing a contrary-to-law claim in this context, the Court's limited role is to "recogniz[e]" the delegation and ensure that the agency has acted within its bounds. *Loper Bright*, 603 U.S. at 395. CMS did precisely that here. Sections 18032(e) and 18041(a) give CMS the authority to establish reasonable conditions governing agents' and brokers' participation in the Federally-facilitated Exchanges, which grants access to sensitive consumer data and Exchanges systems. The challenged rule does precisely that, temporarily pausing one component of a federal registration process for some agents and brokers to obtain access to Federal Exchange systems and enter into annual agreements with CMS permitting them to conduct enrollment transactions through those systems and providing access to sensitive consumer data.

**1. 42 U.S.C. § 18032(e) Directs HHS To Establish Procedures Governing Agent and Broker Participation in Exchange Enrollment.**

HHS has long implemented Congress' direction to establish procedures governing agent and broker participation in the Exchange enrollment process through regulation. *See* 45 C.F.R. § 155.220. As the IFC explains, that regulation includes requirements governing registration, annual training, execution of Exchange agreements, use of Exchange systems, protection of personally identifiable information, standards of conduct, and compliance with applicable federal and state requirements.

NABIP does not dispute CMS's authority to impose those conditions. And Congress's direction to "establish procedures" governing agents' and brokers' participation necessarily affords CMS authority to determine reasonable conditions under which agents and brokers may obtain access to Exchange systems and assist consumers with applying for and enrollment in qualified health plans through the Exchanges. The statute plainly empowers CMS to "'fill up the details' of [this] statutory scheme," *Loper Bright*, 603 U.S. at 395 (quoting *Wayman v. Southard*, 10 Wheat. 1, 43, 6 L.Ed. 253 (1825)), by adopting such procedures, even where the specific measure is not

separately itemized in the statute. *See Mourning v. Fam. Publ'ns Serv., Inc.*, 411 U.S. 356, 372–73 (1973) (upholding agency regulation adopted pursuant to implied authority necessary to prevent evasion of statutory requirements). A temporary pause on new registrants while CMS addresses an identified gap in program integrity issues is a quintessential exercise of this sort of authority.

Consistent with this, section 155.220(o) permits CMS to temporarily to pause registrations when agent or broker conduct poses an "unacceptable risk" to Exchange eligibility determinations, operations, applicants or enrollees, or Exchange information-technology systems, including risks arising from violations of existing standards of conduct and privacy-and-security requirements. The provision thus regulates the timing and conditions of registration under the very participation procedures Congress directed HHS to establish. Nothing in 42 U.S.C. § 18032(e) requires HHS to provide every prospective agent or broker immediate and unconditional access to Exchange systems. To the contrary, Congress left it to the Secretary to establish the procedures under which agents and brokers may participate and assist consumers with applying for and enrollment in coverage through the Exchanges.

NABIP therefore gets the statute backwards when it argues that a temporary registration pause is "the opposite" of a procedure under which States may "allow" agents and brokers to enroll consumers. Pl.'s Mem. 14-15. The authority to establish procedures under which participation is permitted necessarily encompasses authority to establish reasonable prerequisites and program integrity measures governing that participation. Otherwise, HHS could not require registration, training, identity proofing, privacy and security agreements, compliance with standards of conduct, or the other conditions that govern agent and broker access to Exchange systems and sensitive consumer information. This temporary pause in the registration process to address an identified vulnerability is another such safeguard to protect against fraud and abuse.

### 2. 42 U.S.C. § 18041 Reinforces HHS's Authority To Protect the Operation of the Federally-Facilitated Exchanges.

Congress also directed the Secretary to issue regulations establishing standards governing the "establishment and operation of Exchanges," 42 U.S.C. § 18041(a)(1)(A), and, where a State does not establish an Exchange satisfying federal requirements, directed the Secretary to "establish and operate such Exchange" and "take such actions as are necessary to implement" the applicable requirements, *id*. § 18041(c)(1).

The challenged regulation concerns precisely that operational responsibility. Agents and brokers participating in the Federally-facilitated Exchanges obtain access to Exchange systems and consumer PII. The IFC explains that HHS "establishes standards governing access to and use of Federal Exchange systems" in order to "safeguard [personally identifiable information], preserve the integrity and security of Federal information systems, and ensure the proper administration of Federally-facilitated Exchange enrollment and financial-assistance functions." 91 Fed. Reg. at 60,318. The need for such safeguards and program integrity measures is not hypothetical. CMS identified substantial unauthorized enrollment, plan-switching activity and other enrollment practices by new agents and brokers that threatened consumers and could generate improper advance payment of premium tax credit (APTC) expenditures. *Id.* at 60,319. Existing suspension and termination mechanisms generally operate only after an agent or broker has registered and begun assisting consumers and submitting Exchange applications. *Id.* at 60,320. CMS therefore determined that those tools could not fully address the identified vulnerability at the point of entry while CMS completed enhanced identity-verification, authentication, monitoring, and other preventive controls.

Congress's decision to make HHS responsible for establishing and operating the FFEs cannot reasonably be read to require HHS to provide new users access to those systems

notwithstanding an identified systemic vulnerability while safeguards addressing that vulnerability are being implemented. Section 18041 thus reinforces what § 18032(e) already establishes: HHS possesses authority to regulate the conditions under which agents and brokers obtain and exercise access to the FFEs.

**3. 42 U.S.C. § 18033(a)(5) Obligates HHS To Implement Measures To Reduce Fraud and Abuse in Exchanges.**

Finally, after it identified risks arising directly from new agent and broker's participation in the enrollment process governed by § 18032(e) and access to the Exchange systems and processes governed by § 18041, CMS also invoked the authority at 42 U.S.C. § 18033(a)(5). Those provisions direct the Secretary to implement any measure or procedure that the Secretary determines is appropriate to reduce fraud and abuse and that the Secretary "has authority to implement under this title or any other Act." Here, the IFC explains that newly registered agents and brokers were disproportionately associated with unauthorized enrollment activity that raised significant fraud, waste, and abuse concerns and exhibited substantially higher rates across multiple indicators associated with unauthorized enrollment.

CMS therefore adopted a prospective program integrity measure to temporarily pause registration within its existing regulatory program to give it time to create and implement safeguards addressing those identified risks. Section 18033(a)(5) further reinforces, rather than substitutes for, the authority supplied by §§ 18032(e) and 18041.

Rather than being the sole basis of authority for CMS's action, as suggested by Plaintiffs, Pl's Mem. 15-16, section 18033(a)(5) confirms Congress's direction that HHS use authority otherwise conferred by statute to protect against fraud and abuse in the administration and operation of Exchanges. But the Court need not decide whether § 18033(a)(5)(A), standing alone,

would suffice for actions directed at addressing fraud, waste, and abuse, because CMS also expressly relied on the authority provided in sections 18032(e) and 18041.

#### 4. Congress's Express Authorization of Moratoria in Other Programs Does Not Negate the Authority Congress Conferred Here.

NABIP emphasizes that Congress expressly authorized temporary enrollment moratoria for certain Medicare and Medicaid providers and suppliers elsewhere in federal law and argues that Congress's failure to use the word "moratorium" in 42 U.S.C. § 18032(e) precludes HHS from temporarily pausing Exchange agent registration. Pl.'s Mem. 17–18. The "general" rule that when Congress "uses particular language in one section of a statute but omits it in another," *Russello v. United States*, 464 U.S.16, 23 (1983), is not always dispositive, and should not be deemed so here. The Medicare and Medicaid provider-enrollment moratorium provisions NABIP invokes were enacted as part of a distinct statutory and regulatory framework and address a materially different regulatory relationship: the enrollment of providers and suppliers in federal health-benefit programs. Congress's decision to expressly address Medicare and Medicaid provider and supplier enrollment moratoria in those distinct statutory programs says nothing about whether Congress meant to withhold comparable authority from the materially different grant of authority at issue here.

Moreover, NABIP's contrary interpretation would produce an anomalous result. CMS could require an agent to undergo identity proofing, complete training, execute federal privacy and security agreements, comply with federal standards of conduct, and submit to suspension or termination, but it could not temporarily pause new registrations when evidence identifies a vulnerability at the point of entry that existing safeguards cannot address. Nothing in § 18032(e)'s text requires that result.

As explained above, Congress delegated authority to CMS to regulate the Exchanges, including by establishing procedures governing agent-broker participation, 42 U.S.C. § 18032(e), and take action where necessary to ensure they are free of fraud and abuse, *see* 42 U.S.C. §§ 18041, 18033(a)(5). Congress's express authorization of moratoria in other contexts does not undermine that authority. The relevant question here is whether temporarily pausing new registrations falls these authorities, including the authority to implement *any* measure or procedure that the Secretary determines is appropriate to reduce fraud and abuse in the administration of Exchanges. It clearly does.

### 5. Section 155.220(o) Is a Limited Exercise of HHS's Exchange-Administration Authority, Not an Assertion of Boundless Regulatory Power.

NABIP finally characterizes 45 C.F.R. § 155.220(o) as "standardless," emphasizing that the regulation does not establish a numerical threshold for determining when a risk is "unacceptable" or prescribe a fixed maximum duration for a moratorium. Pl.'s Mem. 18-19. But the regulation does not authorize CMS to pause registration whenever it invokes generalized concerns about fraud. Rather, it identifies the particular interests that must be threatened: the accuracy of eligibility determinations, operations, applicants or enrollees, or Exchange information-technology systems. It specifically encompasses risks arising from noncompliance by new agents and brokers with existing standards of conduct and privacy-and-security requirements. And whenever HHS imposes a moratorium, it must publicly identify the effective date, the reasons for imposing it, and its duration.

The current temporary moratorium is appropriately narrow and meets the requirements of § 155.220(o). It does not impact the status of currently registered agents and brokers or prevent returning agents or brokers from registering for PY 2027. It temporarily pauses registrations of agents and brokers who did not execute PY 2026 Exchange agreements while CMS implements

identified additional program integrity measures. CMS considered a broader moratorium covering all agents and brokers but rejected that alternative in favor of targeting the category for which recent data indicated a heightened entry-related risk. 91 Fed. Reg. at 60,332

Whether CMS reasonably determined that the evidence justified this particular temporary moratorium is a separate question addressed below. But that question should not be conflated with whether CMS possesses statutory authority to regulate the registration process in the first place and adopt protective measures to reduce fraud and abuse and protect Exchange consumers. Congress expressly assigned CMS responsibility for establishing the procedures governing agent and broker participation in Exchange enrollment and for establishing and operating the FFEs. *See* 42 U.S.C. §§ 18032(e), 18041. And Congress expressly directed CMS to use its otherwise-existing authority to implement any measure or procedure the Secretary determines necessary to reduce fraud and abuse in Exchange administration. *Id.* § 18033(a)(5). Temporarily pausing new registrations to protect consumers, taxpayers, and Exchange systems while specified safeguards are created and implemented squarely falls within that authority. NABIP therefore has not shown that § 155.220(o) exceeds CMS's statutory authority.

C. **CMS Did Not Act In An Arbitrary Or Capricious Fashion In Issuing The IFR**

Review under the APA's arbitrary and capricious standard is "highly deferential, with a presumption in favor of finding the agency action valid." *Casa de Md. v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 703 (4th Cir. 2019) (citation omitted). An agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). CMS satisfied that standard here. It examined recent enrollment and enforcement data, identified a heightened program integrity risk associated

with new registrants, explained why existing enforcement tools did not adequately address that risk, and adopted a temporary pause while additional preventive controls are implemented.

CMS reasonably concluded from recent Plan Year 2026 data that new registrants presented a heightened program-integrity risk. Newly registered agents and brokers represented approximately 11 percent of agents and brokers with active enrollments but approximately 30 percent of the 569 agents and brokers who received Notices of Intent to Terminate based on enrollment activity raising significant compliance concerns. 91 Fed. Reg. 60,317, 60,321 (Sept. 23, 2026). That was not the only evidence. Compared with previously registered agents and brokers, new agents and brokers had 2.8 times the rate of enrollments with unresolved income-verification issues, 2.7 times the rate of enrollments without Social Security numbers, and 2.6 times the rate of unresolved citizenship or immigration-status verification issues, along with elevated rates across several other indicators. CMS explained that those indicators involve unverified or self-attested information and correlate with confirmed unauthorized-enrollment schemes. *Id.* at 60,321–22.

NABIP's reliance on a potentially smaller number of final terminations does not render CMS's assessment irrational. See Pl.'s Mem. 19–21. Final termination is the result of an individualized enforcement proceeding, whereas CMS was assessing the prospective risk associated with new entrants. CMS explained that recent experience identified a vulnerability whereby new registrants could obtain access to Exchange enrollment functionality before monitoring and post-registration enforcement could identify problematic conduct. That information "materially changed CMS' understanding of both the source of the remaining risk and the adequacy of existing safeguards." 91 Fed. Reg. at 60,325. That explanation supplies the "rational connection between the facts found and the choice made" required by the APA. *Dow*

*AgroSciences v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 471 (4th Cir. 2013). Thus, there is no inconsistency in using the experience of Plan Year 2026 to assess the risks associated with admitting another cohort of new entrants before additional controls are operational.

CMS also reasonably explained why existing individualized enforcement was insufficient. As CMS explained, suspension and termination operate after an agent or broker has registered and begun assisting consumers and submitting Exchange enrollment transactions. 91 Fed. Reg. at 60,320. They therefore cannot prevent unauthorized enrollments, improper coverage changes, or improper advanced premium tax credit expenditures before the harm occurred. *Id.* at 60,320. The IFC also recognized that agents or brokers terminated in a prior year may establish new corporate entities and seek registration as new agents or brokers. *Id.* at 60,324. CMS was not required to wait for harms to befall consumers, taxpayers, or Exchange systems to occur merely because it retained authority to take enforcement action after the misconduct or noncompliance happened.

Furthermore, CMS tailored the temporary moratorium to the problem it identified. Rather than bar all agents and brokers, CMS announced that it is temporarily pausing only new registrants while it completes enhanced identity-proofing, authentication, consumer-authorization, and other program-integrity controls. *Id.* at 60,324. CMS considered a broader moratorium and geographically targeted restrictions and explained why it rejected those alternatives. *Id.* at 60,332–33. The APA does not require an agency to select the "theoretical best solution" to a regulatory problem; it need only adopt a reasonable one. *Bedford Cnty. Mem'l Hosp. v. HHS*, 769 F.2d 1017, 1022 (4th Cir. 1985). CMS also considered the resulting costs to agents and brokers and whether returning agents and brokers would provide consumers adequate enrollment assistance. *Id.* at 60,331–32.

The APA did not require CMS to prove every new agent or broker would engage in misconduct; the agency "need only implement a reasonable solution." *Bedford Cnty. Mem'l Hosp.,* 769 F.2d at 1022. It required that CMS examine the relevant evidence and articulate a "rational connection between the facts found and the choice made." *Casa de Md.,* 924 F.3d at 703 (citation omitted). CMS did so here. It examined recent data, identified a specific vulnerability that existing measures did not adequately address, considered competing interests and alternatives, and adopted a temporary measure directed at that vulnerability while additional safeguards are implemented. NABIP's disagreement with that judgment does not make it arbitrary and capricious.

**D. Plaintiff's Other Clams Lack Merit.**

NABIP also cannot show that CMS has unlawfully withheld or unreasonably delayed agency action. The APA permits a court to compel only a "discrete agency action that [the agency] is required to take." 5 U.S.C. § 706(1), *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). No such duty exists here. Although 45 C.F.R. § 155.220(d) requires agents and brokers to complete training as a condition of registration, it does not require CMS to provide training to new agents and brokers by any particular date. Nor does CMS's prior statement that it would continue to offer annual training impose a judicially enforceable deadline for doing so.

NABIP also seeks mandamus relief. Pl.s' Br., ECF No. 3-1, at 10."[M]andamus will issue only where the duty to be performed is ministerial and the obligation to act peremptory, and clearly defined. The law must not only authorize the demanded action, but require it; the duty must be clear and undisputable." *13th Reg'l Corp.*, 654 F.2d at 760. Although 45 C.F.R. § 155.220(d) requires agents and brokers to complete training before they may participate in the Exchanges, that requirement imposes a condition on agents and brokers; it does not require CMS to make training available to every prospective participant on demand or according to a specified timetable. NABIP

also has an adequate alternative means of pursuing the relief it seeks. Its APA claims directly challenge the validity of both 45 C.F.R. § 155.220(o) and the moratorium that presently prevents new agents and brokers from completing training and registration. Because NABIP has neither identified a clear nondiscretionary duty nor shown the absence of an adequate alternative remedy, mandamus relief is unavailable.

## III. The Equities and Public Interest Weigh Against Emergency Relief

NABIP must independently establish that the balance of equities tips in its favor and that the requested injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Here, CMS explained that unauthorized enrollments and plan switching can disrupt consumers' health coverage and access to physicians and prescription drugs, expose consumers to unexpected medical expenses and tax liabilities, and result in substantial improper federal expenditures. 91 Fed. Reg. 60,317, 60,324 (Sept. 23, 2026). CMS therefore adopted the temporary moratorium as a prospective program-integrity measure intended to reduce those risks rather than relying exclusively on enforcement after potentially harmful transactions had already occurred. *Id.* at 60,320, 60,324–25. CMS's substantial interest in ensuring these lawful measures designed to protect the public are implemented significantly outweighs the speculative financial injuries that Plaintiffs' advance in support of this motion.

Nor does NABIP establish that consumers will lack adequate enrollment assistance without immediate relief. CMS considered that issue when it adopted the moratorium and concluded, based on historical participation rates and the substantial number of returning agents and brokers eligible to participate in Plan Year 2027, that the moratorium would not produce a shortage of enrollment assistance. 91 Fed. Reg. at 60,331–32. NABIP's contrary predictions do not establish

that the public interest requires the Court to order CMS immediately to open its registration process to all prospective new participants.

Finally, even a likely APA violation would not make an injunction automatic. "An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter*, 555 U.S. at 32. NAPIB therefore must establish not only a likelihood of success, but that the present consequences of granting and withholding its requested relief favor immediate judicial intervention. Particularly given the substantial consumer and program-integrity interests implicated by Exchange enrollment and the mandatory, expedited nature of the relief NABIP seeks, it has not carried that burden.

**IV. Any Relief Should Be Appropriately Narrow And Limited To The Parties**

For the reasons explained above, Plaintiff is not entitled to a temporary restraining order. But in the event the Court were to conclude otherwise, any relief it grants should be appropriately limited, consistent with Article III of the Constitution and equitable constraints on the Court's remedial authority.[2] Any relief issued should encompass only the offending portions of the Rule and leave the remainder intact. Further, any relief should be no broader than necessary to afford relief to those who Plaintiff has specifically established stand to be harmed or irreparably harmed. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (*quoting Tyson Foods, Inc. V. Bouaphakeo*, 577 U.S. 442, 466 (2016) ("Article III does not give federal courts the power to order relief to any uninjured plaintiff . . . ."). Plaintiff seeks to avoid the moratorium that prohibits new applicants from obtaining training and accessing the Exchanges before January 15, 2027. And one

[2] Federal Rule of Civil Procedure 65(c) requires the party seeking a temporary restraining order to "give[] security in an amount that the [C]ourt considers proper to pay the costs and damages" that Defendants would sustain as a result. The Court should set a bond here commensurate with "the gravity of the potential harm to the enjoined party" if it enjoins the IFR. *Hoechst*, 174 F.3d at 421 n.3.

such principle of "equity jurisprudence" is that any court-ordered relief "should be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (emphasis added); *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (explaining that "[w]hen Congress empowers courts" via statute "to grant equitable relief, there is a strong presumption that courts will exercise that authority in a manner consistent with traditional principles of equity"). Any emergency relief granted to Plaintiff here should accord with that clear command. *See Casa de Md. v. Wolk,* 486 F. Supp. 3d 928, 971-72 (D. Md. 2020) (explaining that courts are "bound to draw . . . preliminary relief, even in the APA context, narrowly" and limiting a § 705 stay to the plaintiffs that had demonstrated standing). Here, the Court should limit any relief to the two individuals that Plaintiff has specifically identified and alleged as suffering harm.

**CONCLUSION**

For these reasons, the Court should deny the motion for a temporary restraining order.

Dated: October 19, 2026

Respectfully submitted,

KELLY O. HAYES
United States Attorney

<u>/s/ Molissa H. Farber</u>
Molissa H. Farber (802255)
Assistant U.S. Attorney
U.S. Attorney's Office
District of Maryland
36 S. Charles Street, 4th Fl.
Baltimore, MD 21201
(410) 209-4800