**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

NATIONAL ASSOCIATION OF BENEFITS AND INSURANCE PROFESSIONALS,

*Plaintiff*,

v.

ROBERT F. KENNEDY, JR., in his official capacity as SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, and DR. MEHMET OZ, in his official capacity as ADMINISTRATOR OF THE CENTERS FOR MEDICARE & MEDICAID SERVICES, *et al.*,

*Defendants*.

No. 1:26-cv-04311-SAG

Hearing on PI Set for Thursday, November 5 at 10:00 AM

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND A WRIT OF MANDAMUS**

# Table of Contents

I. INTRODUCTION ..... 3

II. STANDARD OF REVIEW ..... 4

III. ARGUMENT ..... 4

A. Plaintiff Cannot Succeed on the Merits Because CMS Had Good Cause to Issue the Regulation Before Completing Notice and Comment Rulemaking ..... 4

B. Plaintiff cannot establish that any delay in providing new agent and broker training is unreasonable as a matter of law ..... 12

1. Factors 1 and 2: No statutory provision imposes a deadline for CMS to provide training to new agents and brokers, and CMS's decision to delay training for new agents and brokers was guided by a "rule of reason." ..... 13

2. Factor 4 Supports the Government's Decision to Delay New Agent and Broker Training ..... 18

3. The Remaining Factors Either Weigh in the Government's Favor or Are Neutral ..... 19

IV. CONCLUSION ..... 21

## I. INTRODUCTION

Plaintiff fails to meet the stringent criteria required for the Court to grant a preliminary injunction against the government. The Secretary determined that due to abusive and fraudulent conduct that has taken place with the Exchanges at the hands of agents and brokers, causing harm to both the government and individual consumers obtaining Affordable Care Act insurance coverage through the Exchanges, he needed to take immediate action to implement program integrity measures. He also determined that it was necessary to impose a temporary pause on registration by new agents and brokers to participate in Exchanges for Plan Year 2027, and he found that publishing notice prior to taking immediate action would undermine the measures he wanted to implement and therefore going through notice and comment rulemaking was impracticable and contrary to the public interest.

Defendants incorporate by reference their opposition to Plaintiff's TRO motion, ECF No. 19 (Oct. 19, 2026), and provide the supplemental argument requested by the Court on the APA's good-cause exception and mandamus under the six factors in *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) (*TRAC*). Plaintiff has not shown a likelihood of success on either issue on which the Court requested additional briefing: CMS had good cause to issue the rule without advance notice and comment, and the *TRAC* factors do not support compelling the agency to open registration to new agents and brokers. Nor has Plaintiff established that its members face irreparable harm. The balance of equities and the public interest likewise favor preserving a temporary measure designed to protect consumers' coverage and sensitive information, safeguard federal funds, and maintain the integrity of the Exchanges. The Court should therefore deny Plaintiff's motion for a preliminary injunction.

## II. STANDARD OF REVIEW

"To obtain the 'extraordinary relief' of a preliminary injunction, the [Plaintiff] must establish the four so-called *Winter* factors: (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm if preliminary relief is not granted; (3) that the balance of equities favors them; and (4) that an injunction is in the public interest." *Robinson v. Nat'l Collegiate Athletic Ass'n*, 172 F.4th 271, 286 (4th Cir. 2026) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Airlines for Am. v. Dep't of Transp.*, 110 F. 4th 672, 674 (5th Cir. 2024) (APA Section 705 stay factors same as preliminary injunction); *Nken v. Holder*, 556 U.S. 418, 435 (2009) (balance of equities and public interest factors merge with government defendant). A "mandatory injunction," where a plaintiff seeks a court order to change the status quo, is "warranted only in the most extraordinary circumstances." *Pierce v. N.C. Board of Elections*, 97 Fed. 4th 194, 209 (4th Cir. 2024) (citations omitted).

## III. ARGUMENT

### A. Plaintiff Cannot Succeed on the Merits Because CMS Had Good Cause to Issue the Regulation Before Completing Notice and Comment Rulemaking

The APA permits an agency to dispense with advance notice and comment rulemaking when it finds that those procedures would be "impracticable, unnecessary, or contrary to the public interest" and incorporates its finding and a brief statement of its reasons in the rule. 5 U.S.C. § 553(b)(B). Although the exception is narrow, it applies where delay could cause serious harm or advance notice would defeat the public interest that the rule protects. *N.C. Growers' Ass'n v. United Farm Workers*, 702 F.3d 755, 766–67 (4th Cir. 2012); *Jifry v. FAA*, 370 F.3d 1174, 1179–80 (D.C. Cir. 2004) (approving use of an IFR). The public-interest ground encompasses

circumstances where announcing a proposed rule would enable the very activity the rule seeks to prevent. *Util. Solid Waste Activities Grp v. EPA*, 236 F.3d 749, 755 (D.C. Circ. 2001) (quoting Attorney General's Manual on the Administrative Procedure Act ("AG Manual"), § 4(b) at 31 (1947)).

The good cause determination is "inevitably fact or context-dependent," and the agency's reasons must be evaluated collectively and considering the circumstances in which the need for the rule was issued. *Mid-Tex Elec. Coop. v. FERC*, 822 F.2d 1123, 1132–33 (D.C. Cir. 1987). In keeping with the APA's limits on judicial review, the deferential "arbitrary, capricious, or abuse of discretion" standard should be applied to the Secretary's determination of good cause. *Philadelphia Citizens in Action v. Schweiker*, 669 F.2d 877, 886 (3d Cir.1982); *United States v. Gavrilovic,* 551 F.2d 1099, 1105–06 (8th Cir. 1977).[1] The question is not whether the Court would have reached the same conclusion in the agency's place, but whether CMS's stated reasons find support in the record. They do.

Here, CMS expressly invoked impracticability and the public interest and explained why both justified immediate action without advance notice. *Patient Protection and Affordable Care Act; Temporary Moratoria on Certain Agent and Broker Registration to Participate in the Exchanges*, 91 Fed. Reg. 60,317, 60,323-26 (Sept. 23, 2026). CMS found that recent enrollment and enforcement data revealed a remaining vulnerability associated with newly registered agents

[1] The question of what standard of review should apply is an open one in the Fourth Circuit. *Compare United States v. Gould*, 568 F.3d 459, 470 (4th Cir. 2009) (accepting Attorney General's explanation for foregoing notice and comment for rule regarding retroactivity of sex offender registration) *with id.* at 477–81 (Michael, J., dissenting) (closely scrutinizing and rejecting that rationale). Other Fourth Circuit decisions hold courts should review "good cause" determinations "closely," *N.C. Growers Ass'n*, 702 F.3d at 767, but that is not inconsistent with arbitrary and capricious review, which is often described as "searching" and "careful," but ultimately deferential to the agency's choices. *Ohio Valley Envt'l Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009).

and brokers. Specifically, CMS found that open enrollment would substantially increase opportunities for unauthorized enrollments, the Exchange would benefit from additional program integrity controls, and advanced notice would create an incentive for the bad actors to accelerate registration to maintain access to the systems and allow the continuation of the harms the moratorium is designed to protect against. These circumstances establish good cause for the IFC.

CMS explained why its assessment—that its prior program integrity actions were inadequate to protect consumers and the Exchange—changed. CMS initially addressed unauthorized enrollment through targeted monitoring and education, suspension and termination of noncompliant agents and brokers, system changes, and other safeguards. *Id.* at 60,325. Those measures produced meaningful improvements and supported continuing targeted interventions rather than restricting participation of new agents and brokers. *Id.* More recent Plan Year 2026 enrollment and enforcement analysis, however, showed that newly registered agents and brokers could obtain access to Exchange enrollment functionality before CMS's monitoring and post-registration enforcement mechanisms could identify problematic conduct. CMS explained that this information "materially changed CMS' understanding of both the source of the remaining risk and the adequacy of existing safeguards." *Id.* CMS had previously declined to impose a moratorium because the information then available did not establish that temporarily restricting otherwise eligible agents and brokers was necessary or appropriately tailored. CMS was also pursuing the aforementioned other program integrity measures. More recent Plan Year 2026 enrollment and enforcement analysis, however, showed that newly registered agents and brokers could obtain access to enrollment functionality before CMS's monitoring and post-registration enforcement mechanisms could identify and address problematic conduct. CMS explained that

this information "materially changed CMS' understanding of both the source of the remaining risk and the adequacy of existing safeguards." *Id.* at 60,325–26.

CMS's revised assessment made further delay untenable. The agency found that without a temporary pause on new registrations consumers would remain exposed to unauthorized enrollments and plan switches. Unauthorized enrollments and plan switches can cause consumers to lose needed coverage, experience coverage gaps, or enter plans that do not cover their health care providers or prescription drugs, resulting in denied claims, unexpected bills, and delayed treatment. *Id.* at 60,324. They also require CMS and issuers to expend substantial resources investigating complaints, reversing unauthorized transactions, and recovering improper payments. *Id.* And they cost hundreds of millions in improperly paid tax credits. *Id.* at 60,323. These concerns were particularly acute before November 1, when open enrollment would increase opportunities for improper activity. CMS identified a "time-limited gap" in program-integrity protections because its additional controls would not be fully operational before the start of Plan Year 2027 open enrollment period. *Id.* at 60,325. CMS found that requiring completion of notice and comment first would leave that gap in place during the period of increased risk. *Id.* at 60,324–25.

The Supreme Court's decision in *Biden v. Missouri*, 595 U.S. 87, 96–97 (2022) supports considering the specific harm of additional delay in light of the heightened risk created by the beginning of the open enrollment period. In granting a stay of injunctions against CMS's vaccination rule, the Court accepted the Secretary's finding that accelerated promulgation before winter would reduce infections, hospitalizations, and deaths. That finding supplied the "something specific" required to forgo advance notice and comment. *Id.* The risks here differ, but CMS likewise identified particular harms expected during an approaching period and explained why

delaying protective action would expose consumers to them. Its justification rests on those findings, rather than a general desire to issue guidance before an administrative deadline.

Nor does CMS's evaluation of the emerging problem render the need for prompt action self-created. In *Missouri*, the Court rejected the contention that the two months spent preparing a substantial rule necessarily contradicted the Secretary's good-cause finding. *Id.* Here, CMS explained that it first assessed the effectiveness of existing measures and analyzed more recent data before concluding that a broader prospective restriction was necessary. 91 Fed. Reg. at 60,325. The agency's earlier success with targeted enforcement does not establish that it could have justified the same moratorium earlier. Once the additional analysis revealed the remaining vulnerability, CMS acted before open enrollment. The relevant question is whether further delay was justified under the circumstances the agency then confronted. The Secretary submits that it was not.

Plaintiff's reliance on *Sorenson Communications, Inc. v. FCC*, 755 F.3d 702, 706–07 (D.C. Cir. 2014), does not require a different result. There, the FCC failed to substantiate its prediction that a funding shortfall required action before notice and comment could be completed. Here, CMS identified ongoing unauthorized enrollment activity, the limitations of existing program integrity controls, and the resulting threats to consumers' coverage and access to treatment during the approaching open enrollment period. 91 Fed. Reg. at 60,321, 60,324–25. Those harms extend beyond administrative expense or uncertain fiscal savings. The range of estimated premium-tax-credit savings does not negate the separately identified consumer-protection rationale, which does not depend on proving an imminent fiscal calamity.

The agency delay cases that Plaintiff cites are also distinguishable. In *NRDC v. NHTSA*, 894 F.3d 95, 114–16 (2d Cir. 2018), the agency relied on the impending expiration of its own

successive delays of a rule's effective date. In *National Venture Capital Ass'n v. Duke*, 291 F. Supp. 3d 5, 15–17 (D.D.C. 2017), the court questioned DHS's unexplained six-month delay and rejected its asserted implementation costs and stakeholder confusion as grounds for bypassing notice and comment. CMS, by contrast, explained why earlier enforcement efforts had initially counseled against a moratorium and why more recent analysis changed that assessment. 91 Fed. Reg. at 60,325. Plaintiff's references to the canceled August webinar and September OMB submission show that preparation preceded publication. They do not, without more, establish that the agency's stated reasons were available long enough to complete notice and comment before the identified risks materialized. *See Missouri*, 595 U.S. at 96--97. CMS relies on that changed assessment and its forecasted consequences of further delay, rather than the enrollment calendar alone.

Advance notice would also affirmatively undermine the rule. The registration process, including training, can be completed in fewer than 30 calendar days. 91 Fed. Reg. at 60,324. Historical data show a surge in registrations after annual training becomes available and before the beginning of open enrollment and CMS estimated that approximately 19,000 new agents and brokers would register during the period covered by the pause absent the moratorium. *Id.* at 60,324–25. A proposed rule announcing such an impending restriction would give prospective registrants both an incentive and an opportunity to complete registration once entry became again available. Bad actors could then obtain access before the restriction took effect and exploit the period before the program integrity controls were fully operational. *Id.* at 60,325–26.

Because the moratorium operates prospectively, it could not prevent registrations already completed in response to that announcement. *Id.* at 60,325. Notice and comment would therefore risk enlarging the population whose entry CMS had determined needed to be paused. This

circumstance is contemplated by the public-interest exception: the procedure itself would facilitate conduct that defeats the rule's stated purpose. The 1947 Attorney General's manual on the APA recognized that the "public interest" exception of § 553(b)(B) was provided to adapt to situations in which "advance notice of . . . [a] rule would tend to defeat [its] purpose," such as the "issuance of financial controls." AG Manual at 31. Courts have consistently recognized this formulation of the exception. *See N.C. Growers' Ass'n*, 702 F.3d at 766 (explaining that the public-interest prong applies where advance notice would defeat the public interest); *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 95 (D.C. Cir. 2012) (recognizing good cause where ordinary procedures would themselves harm the public interest); *Util. Solid Waste*, 236 F.3d at 755 (interpreting the "public interest" standard by reference to the AG Manual).

*Mobil Oil Corp. v. Department of Energy*, 728 F.2d 1477, 1492–93 (Temp. Emer. Ct. App. 1983) likewise supports examining the particular harm that advance notice would cause. Although the court cautioned that the general possibility of opportunistic conduct was insufficient, it upheld the good-cause finding based on anticipated price discrimination, market dislocation, and reduced competition. CMS's asserted harm is similarly more substantial than a desire to avoid administrative inconvenience: unauthorized enrollments can disrupt a consumer's coverage and access to care, and advance registrations would preserve access for new agents and brokers, including the bad actors who are exploiting the system and harming consumers. 91 Fed. Reg. at 60,324–26. That rationale does not require assuming that every new registrant is dishonest. It addresses the consequences of permitting entry by those CMS identified as being most likely to engage in misconduct and fraudulent activity.

Plaintiff argues that advance notice could not have prompted a rush to register because registration for Plan Year 2026 had already closed on July 12, 2026. Pl.'s Mem. at 12, ECF No.

3-1 (PDF page 19). After that date, and consistent with practice in prior years, prospective agents and brokers could not register for PY2026. *See* 2025 *Bulletin: The Marketplace Learning Management System Closes on July 11,* available at https://content.govdelivery.com/accounts/USCMSHIM/bulletins/3e3b980; *2026 Bulletin: The Marketplace Learning Management System Closes on July 12,* available at https://content.govdelivery.com/accounts/USCMSHIM/bulletins/41e60d7. But Plaintiff's reliance on the July 12 closure of Plan Year 2026 registration misses CMS's concern: new entrants could accelerate registration for Plan Year 2027 before a prospective moratorium took effect. The IFC explains that annual registration ordinarily opens in August or September and takes fewer than 30 days. 91 Fed. Reg. at 60,324–25. Because registration takes fewer than 30 days, opening Plan Year 2027 registration during notice and comment would allow new entrants to complete the process before the moratorium could take effect, defeating its purpose of pausing their entry. 91 Fed. Reg. at 60,324–25.

Plaintiff's contention that CMS could have proposed the general moratorium authority earlier likewise does not resolve the problem. *See* Pl.'s Mem. 11–12. CMS explained that the same recent analysis established the need for prospective safeguards and the regulatory mechanism to implement them. 91 Fed. Reg. at 60,325. A proposal authorizing restrictions on registrants without current Exchange agreements would disclose the contemplated mechanism and identify the population whose entry could soon be restricted. It would thus create the same opportunity to accelerate registration before CMS could invoke the program integrity protections. The IFC expressly connected its findings about accelerated registration to adoption of the authority framework in 45 C.F.R. § 155.220(o). *Id.* Accordingly, good cause extends to the enabling provision itself.

Nor does *American Federation of Gov't Employees v. Block*, 655 F.2d 1153, 1157–58 (D.C. Cir. 1981) categorically foreclose immediate adoption of § 155.220(o). That decision upheld emergency regulations on an interim basis but found no justification for issuing comprehensive, permanent regulations extending beyond the immediate exigency without public participation. CMS's argument is that there is a contemporaneous justification for its immediate adoption of the rule, not that a temporary need automatically excuses notice and comment for every permanent provision. The limited duration of the moratorium and opportunity for public participation reinforce this conclusion. *Mid-Tex* recognizes temporal limits as relevant while making clear that interim status alone does not establish good cause and that an agency must proceed diligently during the temporary period. 822 F.2d at 1132–33. The current moratorium is scheduled to remain in effect until February 1, 2027, but is subject to an earlier lifting, extension, or modification through subsequent action by CMS. 91 Fed. Reg. 60,317. Likewise, the moratorium regulation itself, 45 C.F.R. § 155.220(o), is currently receiving public comments and may be retained, modified, or rescinded. *Id.*

Considered together, CMS's contemporaneous findings establish that advance notice and comment were impracticable and contrary to the public interest. The agency identified a recently assessed vulnerability, the harm that could come without the rule, the work needed to address the problem, and demonstrated why advance disclosure would undermine the rule. Section 553(b)(B) permits CMS to act under these circumstances, and Plaintiff is unlikely to prevail on its challenge.

### B. Plaintiff cannot establish that any delay in providing new agent and broker training is unreasonable as a matter of law

Plaintiff also cannot show that CMS has an obligation to provide training. But even if it did make such a showing, it also has not plausibly alleged an "unreasonable delay" claim. To be entitled to relief for such claims, Plaintiff must show that "the agency's delay is so egregious as to

warrant mandamus." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016) (citation omitted). The Court may compel agency action only after it has determined that the agency's delay was unreasonable. That determination is guided by a six-factor analysis announced in *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) [hereafter, "*TRAC*"] ).[2] *See South Carolina v. United States*, 907 F.3d 742, 759 (4th Cir. 2018) (explaining that the *TRAC*-factor analysis is used in "unreasonably delayed" APA challenges); *Hyatt v. U.S. Pat. & Trademark Off.*, 146 F. Supp. 3d 771, 780–81 (E.D. Va. 2015). The *TRAC*-factors are:

> (1) the time agencies take to make decisions must be governed by a "rule of reason," (2) where Congress has provided a timetable . . . [it] may supply content for the this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) . . . the effect of expediting delayed action on agency activities of a higher or competing priority; (5) . . . the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety behind agency lassitude in order to hold that agency action is unreasonably delayed.

*TRAC*, 750 F.2d at 80 (citations omitted). In addition, the agency's responsiveness, or lack thereof, "must be judged in [] light of the resources that Congress has supplied to the agency for the exercise of its functions." *Wright v. Califano*, 587 F.2d 345, 353 (7th Cir. 1978) (holding that plaintiff's delayed decision was reasonable because the Social Security Administration's volume of applications increased and the agency had finite resources to address the increased volume).

Courts typically consider the first two factors together, and they frequently group the third and fifth factors together. *See Janay v. Blinken*, 743 F. Supp. 3d 96, 114, 117 (D.D.C. 2024). Plaintiff cannot establish that CMS's delay was unreasonable under *TRAC*, as all six factors weigh in favor of the government here.

**1. Factors 1 and 2: No statutory provision imposes a deadline for CMS to provide training to new agents and brokers, and CMS's decision to**

[2] Plaintiff has not shown that the Fourth Circuit expressly applies the *TRAC* factors when there is no statutory deadline that Plaintiff alleges was unreasonably delayed.

**delay training for new agents and brokers was guided by a "rule of reason."**

The first and second factors, which "focus on the extent of and reasons for the agency delay," frequently are considered together. *See, e.g.*, *Afghan & Iraqi Allies v. Blinken*, 103 F.4th 807, 816 (D.C. Cir. 2024) ("The second *TRAC* consideration thus 'gives content to the first.'" (quoting *TRAC*, 750 F.2d at 80)). Factors 1 and 2 do not favor mandamus relief in this case. The first factor provides that "the time agencies take to make decisions must be governed by a rule of reason." *Da Costa v. Immigr. Inv. Program Off.*, 80 F.4th 330, 340 (D.C. Cir. 2023) (internal quotation marks and citation omitted). And the second factor considers whether "Congress set a deadline for agency action." *Id.* at 344. Where there is no "precise statutory timetable or other factors counseling expeditious action, an agency's control over the timetable" to issue decisions "is entitled to considerable deference." *See Mexichem Specialty Resins, Inc.*, 787 F.3d at 555. Together, these factors "get at whether the agency's response time complies with an existing specified schedule and whether it is governed by an identifiable rationale" and whether there is any "rhyme or reason" for the agency's delay. *Chowdhury v. Blinken*, No. 21-CV-1205, 2022 WL 136795, at *3 (D.D.C. Jan. 14, 2022) (citing *Ctr. for Sci. in the Pub. Int. v. FDA*, 74 F. Supp. 3d 295, 300 (D.D.C. 2014)).

Here, there is no "specific schedule" or deadlines (statutory, regulatory, or otherwise) governing when, or even if, CMS must provide training to new agents and brokers. Thus, under the first and second factors, Plaintiff fails to establish an unreasonable delay because there are no Congressionally imposed deadlines for CMS to provide training for new agents and brokers and because CMS comports with a "rule of reason" in delaying new agent broker training before the Plan Year 2027 open enrollment period begins. *See Sierra Club v. Thomas*, 828 F.2d 783, 797 (D.C. Cir. 1987) (citation omitted); *partially abrogated by statute as recognized by Mexichem*

*Specialty Resins, Inc. v. E.P.A.*, 787 F.3d 544, 553 (D.C. Cir. 2015) ("Congress has partly abrogated *Sierra Club v. Thomas*, but its analytical framework for determining whether EPA's delay was unreasonable remains applicable to whether Petitioners may be excused for their failure to exhaust their administrative remedies."). The amount of time an agency action has been pending does not by itself determine whether an agency's alleged delay is "unreasonable." *Liberty Fund, Inc. v. Chao*, 394 F. Supp. 2d 105, 115 (D.D.C. 2005) (rejecting argument that an agency action is unreasonable "based solely on the length of a processing delay" (citation omitted)). "In assessing whether an agency follows a rule of reason, we evaluate the length of the delay in light of 'the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency.'" *Da Costa*, 80 F.4th at 340 (quoting *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003)). Thus, even a years-long delay does not necessarily mean an agency has not followed a rule of reason. *See Liberty Fund,* 394 F. Supp. 2d at 114–15 (citing cases in which courts have concluded that two-year and four-year delays are not unreasonable).

Without any authority cited, Plaintiff argues that CMS's general historical practice of conducting agent and broker training in July or August most years "effectively fixes a deadline." Pl.'s Br. at 32. The authorities Plaintiff does cite involved instances where the government was allegedly required to complete discrete actions within a reasonable time, *see Hyatt, supra*; *Viet. Veterans, supra* (regulation required government to notify veterans "when . . . information becomes available"); *Afghan & Iraqui Allies*, *supra* (statutory deadline to complete within nine months); *Gonzalez v. Cuccinelli*, 985 F.3d 357 (4th Cir. 2021) (unreasonable delay in an adjudication); *Mohammad v. Blinken*, 548 F. Supp. 3d 159 (D.D.C. 2021) (unreasonable delay in processing an application), and Plaintiff has not shown that a historical practice implicates the

same analysis as a task that is expressly imposed on an agency. Unlike applications and adjudications that the government must complete, CMS had no statutory requirement to conduct the trainings for agents and brokers at all.

*Hyatt* is instructive as to how narrow the proper analysis should be. In that case, the plaintiff sought mandamus against the U.S. Patent and Trademark Office on the grounds that the agency unreasonably delayed processing of his patent applications for over two decades. 146 F. Supp. 3d at 777. Federal patent law is structured to compensate inventors for time delay in patent issuance if, through fault of the agency, it takes the agency longer than three years to issue a patent. *Id.* at 783. But Congress nonetheless stopped short of imposing a three-year deadline on examination. *Id.* at 783–84. As such, the Court rejected plaintiff's mandamus claim, holding that "even if a court were to disagree" with PTO's examination of plaintiff's application, that was "not sufficient, absent some contrary legal edict, to interfere with the agency's process." *Id.*

Likewise, Congress did not impose any statutory deadline for CMS to provide new agent and broker training. Given the tasks that CMS wants to implement to protect consumers and the integrity of the Exchanges, it follows that CMS has a "rule of reason" in delaying training for some agents and brokers. *See Da Costa*, 80 F. 4th at 340. Plaintiff argues that CMS has historically provided training to all agents and brokers in July and August each year. Compl., ECF No. 1, ¶ 23. But Plaintiff also concedes that there have been exceptions that delayed the training in some years. *Id.* And Plaintiff cites no authority that imposes a mandatory, non-discretionary deadline based on historical practice. Congress imposed no requirement on CMS to conduct agent and broker training. The fact that CMS historically scheduled training for agents and brokers before open enrollment does not make that a requirement or in any way establish a required deadline. And the fact that new agents and brokers historically received training before open enrollment

does not mean that CMS is unreasonable in delaying training for new agents and brokers this year to respond to the identified vulnerabilities and to give the agency time to fully implement the necessary protections for consumers and the Exchanges and ensure the measures are fully functional.

A delay of a few months—one open enrollment period—standing alone, does not suggest that CMS is not following a rule of reason. In fact, courts have declined to intervene in cases with much longer delays and where the potential harm is far more serious. *See, e.g.*, *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (four years); *Sierra Club*, 828 F.2d at 797–98 (three years); *Diakanua v. Rubio*, No.CV 24-1027, 2025 WL 958271, at *6 (D.D.C. Mar. 31, 2025) (two and a half years).

In *Mexichem Specialty Resins, Inc.*, the D.C. Circuit considered whether the Environmental Protection Agency ("EPA") had unreasonably delayed issuing a reconsideration decision on a rule it initially promulgated in 2012 pursuant to the Clean Air Act. *Mexichem Specialty Resins, Inc.*, 787 F.3d at 554. At issue was an EPA rule limiting the concentration of certain carcinogens that manufacturers of polyvinyl chloride ("PVC") pipes permissibly could release into the air and water as a byproduct of the manufacturing process. *Id.* at 550. Immediately after the rule was issued, a group of PVC manufacturers petitioned the EPA for reconsideration, challenging the substance and procedure of the rule. *Id.* at 551. The EPA granted that petition and began the process of reconsidering its decision, estimating that its review would take about four years. *Id.* at 554. During that process, the PVC manufacturers submitted additional materials to the EPA for the agency to consider. *Id.* After that reconsideration process had been pending for about three years, the manufacturers sought judicial relief alleging, among other things, that the EPA had unreasonably delayed issuing a reconsidered decision. *Id.* at 555. The D.C. Circuit rejected that

claim. *Id.* The court reasoned that EPA's three year-delay was not unreasonable given that Congress had not imposed any deadline for the EPA to issue a reconsideration decision and that the agency action at issue involved complex, technical matters. *Id.*

That is the case here. Congress did not impose any deadlines on CMS to train new agents and brokers. Nor did CMS self-impose any deadlines by which it must provide training for new agents and brokers. CMS had a reasoned basis, supported by data, for its decision to delay this training. Therefore, the first two TRAC factors support CMS.

#### 2. Factor 4 Supports the Government's Decision to Delay New Agent and Broker Training

The fourth *TRAC* factor—one that can overcome the rest—considers the effect of expediting the action Plaintiff seeks "on agency activities of a higher or competing priority." *Thakker v. Renaud*, No. CV 20-1133, 2021 WL 1092269, at *7 (D.D.C. Mar. 22, 2021) (citing *Mashpee Wampanoag Tribal Council,* 336 F.3d at 1100). In other words, will expediting training for new agents and brokers "harm other agency activities of equal or greater priority?" *Id.* There is no doubt that expediting training for new agents and brokers, thereby causing an influx of new agents and brokers into the system, will compete with the agency's activities designed to protect consumers and the integrity of the Exchanges from bad actors who access the Exchanges to engage in fraudulent activity and misconduct. For example, CMS had legitimate concerns that agents and brokers who had been terminated from participating in the Exchanges in prior years for bad conduct could try to use a false identity and register as a new agent or broker. *See* Wu Dec. ¶ 10 (explaining that agents and brokers terminated in prior years could form a new corporation using false identities or form new corporations and hire newly licensed individuals as employees). Such bad actors could also use a new corporate entity to hire newly licensed agents and brokers to work for the new company. *Id.* CMS needed time to create safeguards to prevent these types of harmful

actions. CMS's decision to limit entry for this coming open enrollment period to established agents and brokers was rational.

Thus, this *TRAC* factor weighs heavily in favor of finding the agency decision to delay training for new agents and brokers for one open enrollment period was not unreasonable and that otherwise allowing a flood of new agents and brokers access to the Exchanges competes with the agency's priority of protecting consumers and the Exchanges.

And even in cases involving Congressionally imposed deadlines and matters affecting public health and safety, which is not the situation that Plaintiff presents, the D.C. Circuit has declined to grant relief simply because doing so would interfere with the President's and Federal agencies' discretion to prioritize competing matters. *See In re Barr Lab'ys.*, 930 F.2d 72, 75 (D.C. Cir. 1991); *Sierra Club*, 828 F.2d at 797–98. Courts "have no basis for reordering agency priorities." *In re Barr*, 930 F.2d at 76. Rather, agencies are "in a unique—and authoritative—position to view [their] projects as a whole, estimate the prospects for each, and allocate [their] resources in the optimal way." *Id.* For this additional reason, the Court should not disregard the priorities that the Secretary set to protect consumers and the Exchanges. The fourth *TRAC* factor weighs heavily in the government's favor.

### 3. The Remaining Factors Either Weigh in the Government's Favor or Are Neutral

The third and fifth *TRAC* factors, which have the court consider Plaintiff's interests and whether the allegedly delayed actions affect health and welfare, also cut against mandamus because Plaintiff's interests are economic and do not directly implicate human health and welfare. *See Sychev v. Jaddou*, No. CV 20-3484, 2022 WL 951378, at *6 (D.D.C. Mar. 30, 2022).

The third and fifth *TRAC* factors together consider whether the allegedly delayed agency decision will affect the public's "health and welfare" and the nature and the "extent of the interests

prejudiced by delay." *TRAC*, 750 F.2d at 80. "[E]conomic harms are entitled to less weight in the [*TRAC*] analysis." *Janay*, 743 F. Supp. 3d at 117; *see also Maxichem Spec. Resins,* 787 F.3d at 555 (rejecting unreasonable-delay claim in part because the plaintiffs "ha[d] not shown that their interests (in this case, financial) will be irreparably harmed if the court awaits the outcome of EPA's reconsideration proceeding").

The Complaint does not identify any public health benefit or safety concerns created by CMS's alleged delay. Nor could it, where one purpose of the delay was to allow CMS to implement program integrity measures to protect consumers (i.e., "the public") and the Exchanges. The only interest of new agents and brokers is pecuniary: the ability to make commissions and enrollment fees. *See* Pl.'s Br., ECF No. 3-1, at 33 (agents and brokers unable to enroll will forego commissions); *see also* Chamberlain Dec., ECF No. 3-3, ¶ 14 (projecting income based on commissions for signing up ACA clients). Because "economic harms are entitled to less weight," *see Janay*, 743 F. Supp. 3d at 96, factors three and five weigh in CMS's favor.

Finally, the sixth *TRAC* factor weighs in CMS's favor (and, at worst, it is neutral). That factor considers whether the government has acted in bad faith or malfeasance. *See Diakanua*, 2025 WL 958271 at *9; *see also In re Monroe Commc'ns Corp*, 840 F.2d 942, 947–48 (D.C. Cir. 1988). Plaintiff's Complaint does not suggest CMS's delay is attributable to bad faith or malfeasance, nor does it allege facts that would invite such an inference. To the contrary, CMS's notice imposing the moratorium explained that CMS wanted to implement new program integrity measures to protect consumers and the Exchanges before letting new agents and brokers into the system. It also sought to prevent previously terminated agents and brokers from surreptitiously forming new corporate entities to avoid their terminations and gain access to consumers and the Exchanges.

* * *

Each of the *TRAC* factors weighs in favor of CMS or is, at most, neutral. Consequently, CMS's alleged delay is reasonable, and this Court lacks mandamus jurisdiction. Should the Court find that a stay of the moratorium is warranted, CMS will make training for new agents and brokers available by the close of the next business day. Wu Dec. ¶ 16.

## IV. CONCLUSION

For these reasons, the Court should deny Plaintiff's motion.

Dated: October 29, 2026

Respectfully submitted,

KELLY O. HAYES
United States Attorney

/s/ Molissa H. Farber
Molissa H. Farber (802255)
Assistant U.S. Attorney
U.S. Attorney's Office
District of Maryland
36 S. Charles Street, 4th Fl.
Baltimore, MD 21201
(410) 209-4800
*Attorney for Defendants*