**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| NATIONAL ASSOCIATION OF BENEFITS AND INSURANCE PROFESSIONALS,<br><br>*Plaintiff*,<br><br>v.<br><br>ROBERT F. KENNEDY, JR. et al.,<br><br>*Defendants*. | Civil Action No. 1:26-cv-04311-SAG |

# PLAINTIFF NABIP'S REPLY IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTIVE RELIEF, AND A WRIT OF MANDAMUS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

ARGUMENT ........ 2

I. NABIP Is Entitled to a Preliminary Injunction or Stay of the Moratorium ........ 2

A. HHS Did Not Have Good Cause To Promulgate Section 155.220(o) Without First Providing Public Notice and an Opportunity To Comment ........ 3

B. The Moratorium Irreparably Harms NABIP's Members ........ 6

C. The Balance of Equities and the Public Interest Favor Entering Relief ........ 8

D. The Court Should Grant Uniform Relief and Set, at Most, a Nominal Bond ........ 8

II. Although Likely No Longer Needed, NABIP Would Also Be Entitled to Mandamus ........ 9

A. Without the Moratorium, Any Continued Refusal To Allow New Agents and Brokers for Plan Year 2027 Unlawfully Withholds Required Action ........ 10

B. Alternatively, Without the Moratorium, Any Continued Refusal To Allow New Agents and Brokers for Plan Year 2027 Unreasonably Delays Required Action ........ 12

CONCLUSION ........ 15

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822 (D. Md. 2025) ....................9

*Barrios Garcia v. U.S. Dep't of Homeland Sec.*, 25 F.4th 430 (6th Cir. 2022)....................14

*Biden v. Missouri*, 595 U.S. 87 (2022) ....................6

*Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25 (D.D.C. 2020) ....................6

*Casa de Md., Inc. v. Trump*, 971 F.3d 220 (4th Cir. 2020) ....................9

*Casa de Md., Inc. v. Wolf*, 486 F. Supp. 3d 928 (D. Md. 2020) ....................9

*Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11 (D.D.C. 2017) ....................10

*City of Columbus v. Kennedy*, 796 F. Supp. 3d 123 (D. Md. 2025) ....................8, 9

*E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018)....................5

*Gonzalez v. Cuccinelli*, 985 F.3d 357 (4th Cir. 2021) ....................15

*Int'l Union (UAW) v. NLRB*, 459 F.2d 1329 (D.C. Cir. 1972) ....................3

*League of Women Voters of the U.S. v. U.S. Citizenship & Immigr. Servs.*, 839 F. Supp. 3d 292 (D. Md. 2026) ....................2, 9

*Lovo v. Miller*, 107 F.4th 199 (4th Cir. 2024)....................10

*Maryland v. Corp. for Nat'l & Cmty. Serv.*, 785 F. Supp. 3d 68 (D. Md. 2025)....................9

*Mid Continent Nail Corp. v. United States*, 846 F.3d 1364 (Fed. Cir. 2017)....................6

*Mobil Oil Corp. v. Dep't of Energy*, 728 F.2d 1477 (Temp. Emerg. Ct. App. 1983)....................5

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197 (4th Cir. 2019)....................7

*Nat'l Fair Hous. All. v. U.S. Dep't of Hous. & Urb. Dev.*, 2025 WL 2105567 (D.D.C. July 28, 2025)....................14

*N.C. Growers' Ass'n v. United Farm Workers*, 702 F.3d 755 (4th Cir. 2012)....................5

*Nw. Airlines, Inc. v. Goldschmidt*, 645 F.2d 1309 (8th Cir. 1981) ....................5

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ....................10

*NRDC v. NHTSA*, 894 F.3d 95 (2d Cir. 2018) ....................5

*Poindexter v. Strach*, 324 F. Supp. 3d 625 (E.D.N.C. 2018) ....................7

*PSEG Renewable Transmission LLC v. Arentz Fam., LP*, 185 F.4th 497 (4th Cir. 2026) ....................7

*Purdue Univ. v. Scalia*, 2020 WL 7340156 (D.D.C. Dec. 14, 2020) ....................5

*Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75 (4th Cir. 1989) ....................7

*South Carolina v. United States*, 907 F.3d 742 (4th Cir. 2018) ....................12, 14

*Tenn. Gas Pipeline Co. v. FERC*, 969 F.2d 1141 (D.C. Cir. 1992) ....................5

*United States v. Gould*, 568 F.3d 459 (4th Cir. 2009) ....................5

*United States v. Reynolds*, 710 F.3d 498 (3d Cir. 2013) ....................5

*Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749 (D.C. Cir. 2001) ....................5

*Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148 (4th Cir. 1995) ....................4

*Yazdan Pouri v. U.S. Dep't of Homeland Sec.*, 2026 WL 1508425 (D.D.C. May 30, 2026) ....................14

**STATUTES AND REGULATIONS**

5 U.S.C.:

§ 553 ....................6

§ 705 ....................2, 9

§ 706(1) ....................11, 12, 15

42 U.S.C. § 18031(c)(6)(B) ....................10

45 C.F.R.:

§ 155.220(c) ....................11

§ 155.220(o) ....................1, 2, 3, 4, 5, 9, 11, 13, 14, 15

§ 155.410(d) ....................11

§ 155.410(e)(5)(i) ....................11

**AGENCY ORDERS**

Interim Final Rule With Comment Period, *Patient Protection and Affordable Care Act; Temporary Moratoria on Certain Agent and Broker Registration to Participate in the Exchanges*, 91 Fed. Reg. 60317 (Sept. 23, 2026).....3, 4, 8, 11, 12, 13

**OTHER AUTHORITIES**

U.S. Dep't of Just., Attorney General's Manual on the Administrative Procedure Act (1947)........5

## INTRODUCTION

The government's arguments are mutually inconsistent. To justify skipping notice and comment, the government asserts that it needed a new moratorium-authorizing rule to stop about 19,000 new agents and brokers from completing training and registering for Plan Year 2027. But in opposing mandamus relief, the government asserts that a moratorium was *not* needed to stop those agents and brokers from registering. According to the government, CMS has no legal obligation to let any agent or broker train or register before open enrollment, meaning that CMS could have achieved the same moratorium with no new rule.

Both arguments cannot be correct. If CMS has no legal obligation to let agents and brokers register before open enrollment, its good-cause argument collapses. CMS could have simply refused to start the required training; no new rule needed. But if Section 155.220(o) granted new authority to stop new agents and brokers from training and registering — as HHS said that it did — CMS must promptly let them do so once the moratorium is enjoined or stayed.

In the end, CMS gives up on its second argument. If the Court "stay[s] . . . the moratorium . . . , CMS *will make training* for new agents and brokers available" — no mandamus needed. PI Opp'n at 21 (emphasis added). And the Court should stay the moratorium. HHS had no good cause for promulgating Section 155.220(o) without notice and comment. The government's latest filing adds nothing to its prior brief on this point. Indeed, the government's opposition is most notable for what it does *not* say: no explanation for the August webinar cancelation, no information about the moratorium document sent to OMB in early September, and no further data to support the notion that new agents and brokers last year were disproportionately worse than returning agents and brokers.

NABIP has a likelihood of success on the merits. Its members are also suffering and will continue to suffer irreparable harm while CMS's moratorium remains in effect, as additional

declarations confirm. The public is also harmed. Open enrollment has started, and fewer agents and brokers are available to assist people who need help choosing the right health-care plan. The government suffers no harm from lifting the unlawfully imposed moratorium. And CMS "has now implemented the program integrity measures" it said were needed. Wu Decl. ¶ 13.

For these reasons, the Court should grant NABIP's motion and preliminarily enjoin or stay the moratorium. Given the government's commitment to "make training for new agents and brokers available by the close of the next business day," PI Opp'n at 21; *accord* Wu Decl. ¶ 16, NABIP should not also need mandamus relief. But NABIP would be entitled to it, if such relief were necessary. The statute and HHS rules impose a legal obligation on CMS to conduct training and let trained agents and brokers register before open enrollment starts. Refusing to do so would unlawfully withhold required action. Alternatively, the refusal would unreasonably delay that action, given HHS's long history of conducting training well before the start of open enrollment, the harms to the public and to NABIP members, the minimal impact on HHS and CMS, and those agencies' refusal to come clean with the Court.

## ARGUMENT

### I. NABIP Is Entitled to a Preliminary Injunction or Stay of the Moratorium

NABIP showed that it is likely to succeed on the merits and that its members will suffer irreparable harm from the moratorium, which will also harm the public, while any harm to the government is minimal. *See* NABIP Mem. at 10-23, 27-30. The Court should therefore enjoin Defendants from enforcing the moratorium. Alternatively, the Court should stay the moratorium under 5 U.S.C. § 705, by staying either Section 155.220(o) or CMS's declaration of a moratorium under that rule. *See*, *e.g.*, *League of Women Voters of the U.S. v. U.S. Citizenship & Immigr. Servs.*, 839 F. Supp. 3d 292, 348, 352 (D. Md. 2026) (construing preliminary injunction motion as one for a Section 705 stay and granting it as to APA claims).

### A. HHS Did Not Have Good Cause To Promulgate Section 155.220(o) Without First Providing Public Notice and an Opportunity To Comment

At the prior hearing, the Court saw "almost no way the Government is going to get around the . . . good cause issue." Hr'g Tr. at 48:1-2 (Oct. 21, 2026). The Court gave the government the chance to say more, *see id.* at 48:21-22, but its second bite at the apple also fails.

As before, the government reasons backwards. According to the government, CMS found a new and urgent need to impose a moratorium; public notice of the planned moratorium would lead "bad actors to accelerate registration"; and so public notice of the new HHS rule that authorized CMS to declare a moratorium also would undermine the resulting moratorium. PI Opp'n at 5-6, 11; *see* TRO Opp'n at 15-16. The government's argument fails at each step.

*First*, the limited data in the Interim Final Rule does *not* show that new agents and brokers pose an "unacceptable risk," which is the finding Section 155.220(o) requires CMS to make to impose a moratorium. *See* NABIP Mem. at 19-22 & n.11; Hr'g Tr. at 19:2-21:9. The government never mentions the "unacceptable risk" standard. It also adds none of the data missing from the Interim Final Rule. While the government provides more information about terminated agents and brokers for Plan Year 2026 — now 520, *see* Wu Decl. ¶ 10 (out of 84,012, so 0.6 percent) — the new data does *not* distinguish new from returning agents and brokers. The government also does not provide the absolute numbers behind the relative comparisons in the Interim Final Rule. *See* 91 Fed. Reg. at 60321.

The government's failure to provide this information strongly suggests that the data would undermine CMS's assertion that new agents and brokers, as a class, pose an unacceptable risk. As the D.C. Circuit explained, "when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him." *Int'l Union (UAW) v. NLRB*, 459 F.2d 1329, 1336 (D.C. Cir. 1972). The Fourth Circuit

agrees: "the mere failure, without more, to produce evidence that naturally would have elucidated a fact at issue permits an inference" that the "evidence . . . would have exposed facts unfavorable to the party." *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995). The Court should draw that inference here.

*Second*, the government asserts that "new entrants could accelerate registration for Plan Year 2027 before a prospective moratorium took effect." PI Opp'n at 11. Yet the government agrees that, after July 12, 2026, no additional agents or brokers could have become returners for Plan Year 2027. *See* Wu Decl. ¶ 15. It is also undisputed that training (for returners only) started September 15, 2026. Compl. ¶ 23. The government does not say why those two months — a period when no new agent or broker could have "accelerate[d] registration," PI Opp'n at 11 — were insufficient to provide notice of and a chance to comment on Section 155.220(o).

The government also does not support its assertion that notice would have meaningfully changed new agent or broker behavior. Every year, there is "a surge in new agent and broker registration . . . when plan year training and registration becomes available (usually August or September) through October (in advance of the November 1 beginning of Open Enrollment)." 91 Fed. Reg. at 60328 & n.24. Indeed, the government data the Interim Final Rule cites shows that about 70 percent of the new agents and brokers who registered by February 1 of a plan year did so by October 31 of the prior year. *See* Angstreich Decl. ¶ 5. That is no "surge." That is the ordinary behavior of new agents and brokers preparing for open enrollment. The government's assertion that notice of a moratorium rule would have induced a meaningful number of people to register *faster than they otherwise would have* lacks any plausible basis.

*Third*, the government is wrong that an acceleration in registration — even assuming it were real and material — would be good cause to skip notice and comment before promulgating

Section 155.220(o).[1] The "burden is on the agency to establish that notice and comment need not be provided" and, when the government (as here) relies on the public interest prong of the good cause exception, to show that "the use of notice and comment [would] actually harm the public interest." *NRDC v. NHTSA*, 894 F.3d 95, 113-14 (2d Cir. 2018). The government does not cite a single case finding good cause under the public interest prong on facts like these.

Take the government's lead case: *Utility Solid Waste Activities Grp. v. EPA*, 236 F.3d 749 (D.C. Cir. 2001). *See* PI Opp'n at 5. The D.C. Circuit *rejected* EPA's bases for skipping notice and comment. *See* 236 F.3d at 755. The court also described the 1947 Attorney General's Manual, which the government also cites (at 10), as addressing situations "when announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent." *Id.* That gloss is not surprising, because the rush to raise prices ahead of a price freeze is the rare circumstance where courts have found the public interest prong satisfied. *See Mobil Oil Corp. v. Dep't of Energy*, 728 F.2d 1477, 1492-93 (Temp. Emerg. Ct. App. 1983); *see also Tennessee Gas Pipeline Co. v. FERC*, 969 F.2d 1141, 1146 (D.C. Cir. 1992) (recognizing that the price regulation at issue in *Mobil Oil* presented "special circumstances").

Outside of that context, courts regularly reject agency claims that the risk of rule evasion justifies skipping notice and comment. *See*, *e.g.*, *Purdue Univ. v. Scalia*, 2020 WL 7340156, at *10-12 (D.D.C. Dec. 14, 2020); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 777-78 (9th

[1] The government is also wrong about the standard of review. Both *United States v. Gould*, 568 F.3d 459 (4th Cir. 2009), and *N.C. Growers' Ass'n v. United Farm Workers*, 702 F.3d 755 (4th Cir. 2012), hold that the good cause exception is "construed narrowly." *Gould*, 568 F.3d at 470; *see also N.C. Growers' Ass'n*, 702 F.3d at 767 ("We construe the good cause exception narrowly." (citing *Gould*)). Other circuits agree. *See United States v. Reynolds*, 710 F.3d 498, 507 (3d Cir. 2013) (court must "examine[] closely proffered [good cause] rationales"); *Nw. Airlines, Inc. v. Goldschmidt*, 645 F.2d 1309, 1320 n.16 (8th Cir. 1981) (good cause "requires legitimate grounds supported in law and fact").

Cir. 2018). It is always true that "the announcement of a proposed rule may, at least to some extent and in some circumstances, encourage those affected by it to act before it is finalized," but that possibility does not supply good cause to skip notice and comment unless there is "evidence in the administrative record" of "consequences so dire as to warrant dispensing with notice and comment procedures." *Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 46 (D.D.C. 2020). Allowing the government to satisfy a more lenient public interest prong would lead good cause to "become an 'all purpose escape-clause' to the APA's rulemaking provisions." *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1380 (Fed. Cir. 2017).

Nor is this case anything like *Biden v. Missouri*, 595 U.S. 87 (2022). *See* PI Opp'n at 7. There, the Court accepted the "Secretary's finding that accelerated promulgation of the rule in advance of the winter flu season would significantly reduce COVID-19 infections, hospitalizations, and deaths." *Biden*, 595 U.S. at 96. Here, the government points to CMS's speculation that some unspecified number of licensed professionals would have completed government-run training and registered for Plan Year 2027 slightly earlier than they otherwise would have. To say, as the government does (at 7), that "[t]he risks here differ" is an understatement. The risks are not even in the same galaxy.

For these reasons, NABIP is likely to succeed on the merits of its Section 553 argument.[2]

**B. The Moratorium Irreparably Harms NABIP's Members**

The government does not add to its prior irreparable harm arguments. As NABIP explained at the prior hearing, those arguments fail. NABIP briefly addresses a few points.

---

[2] If the Court agrees, it need not address NABIP's additional likelihood of success arguments: that HHS lacks statutory authority to promulgate a moratorium rule, NABIP Mem. at 14-19, and that, even if HHS had such authority and good cause to skip notice and comment, CMS arbitrarily and capriciously imposed a moratorium without substantial evidence, *id.* at 19-23. NABIP is likely to succeed on those arguments as well.

*First*, contrary to the government's claim (TRO Opp'n at 11-13), the Fourth Circuit has made clear that unrecoverable money losses are irreparable, even when they do not threaten a party with bankruptcy. *See Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 217-18 (4th Cir. 2019); *PSEG Renewable Transmission LLC v. Arentz Fam., LP*, 185 F.4th 497, 513 (4th Cir. 2026) (monetary losses are irreparable "if they are unrecoverable").

*Second*, Mr. Fristoe and Ms. Chamberlain's parents (and employers) are NABIP members. *See* Fristoe Suppl. Decl. ¶ 3; G. Chamberlain Decl. ¶ 2. And Mr. Chamberlain has explained the math behind his daughter's expected $96,000 lost commissions. *See* G. Chamberlain Decl. ¶¶ 3-5.

*Third*, the government's argument that NABIP delayed too long before filing suit is based on a case involving nine months of delay. *See Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989). In contrast, *Poindexter v. Strach* found irreparable harm, even though the plaintiffs "waited a month after the enactment [of the challenged law] to file suit and waited weeks after that to seek injunctive relief." 324 F. Supp. 3d 625, 634 (E.D.N.C. 2018). NABIP sued and sought emergency relief three weeks after the Interim Final Rule. Those three weeks do not undermine NABIP's irreparable harm showing.

*Fourth*, additional NABIP members confirm the irreparable harms the moratorium causes. *See* Hr'g Tr. at 50:11-12 ("[P]laintiffs are free to attach evidence to their filing on the 4th as well."). After hiring 45 new agents who could not get trained before open enrollment, Keystone Advisors will lose $2.2 million in expected revenue this year, and even more in future years from turning away potential clients this year. Neal Decl. ¶¶ 17-19. Jim Christensen retired from an engineering job to join his wife's insurance business, relying on the ability to register as a new agent for Plan Year 2027, harming himself and his wife's business. *See* Christensen Decl.

¶¶ 4-9. And Next Step Insurance hired a new agent — who registered for prior plan years but not 2026 — on the expectation that new agent registration would be available as in prior years, costing an expected $100,000 in commissions, the loss of new clients, and reputational harms. *See* George Decl. ¶¶ 6-9, 11-19.

### C. The Balance of Equities and the Public Interest Favor Entering Relief

Two new facts relevant to these factors support granting NABIP's motion.

*First*, there is now government data on how many returning agents and brokers have registered before the start of open enrollment: about 75,600. *See* Angstreich Decl. ¶ 4. That is about 8,500 fewer agents and brokers than those with at least one active enrollment last year. *See* 91 Fed. Reg. at 60321 n.11. And, last year, about 490,000 people secured health-care plans during open enrollment with help from about 7,000 new agents and brokers. *Id.* at 60321 n.11, 60332. The lack of new agents and brokers thus threatens harm to the public, especially given new CMS rules requiring registered agents and brokers to perform work that clerical staff could do in prior years. *See* A. Chamberlain Decl. ¶ 4.

*Second*, "CMS has now implemented the program integrity measures" that it claimed were necessary "protections against agent and broker fraud for Plan Year 2027." Wu Decl. ¶¶ 12-13. That undermines the government's prior claims of harm from allowing new agents and brokers to register in the absence of those measures.

### D. The Court Should Grant Uniform Relief and Set, at Most, a Nominal Bond

***Uniform Relief.*** In fashioning relief, the Court should follow *City of Columbus v. Kennedy*, 796 F. Supp. 3d 123 (D. Md. 2025). There, Judge Hurson stayed certain HHS rules implementing the ACA in their entirety, without limiting relief to the plaintiffs. *See id.* at 175-76. The Court should grant relief from the moratorium to all new agents and brokers.

The government's argument that relief should run only to Mr. Fristoe and Ms. Chamberlain is meritless. *See* TRO Opp'n at 32. Judge Xinis rejected that same argument in the case the government cites. *See Casa de Md., Inc. v. Wolf*, 486 F. Supp. 3d 928, 970 (D. Md. 2020). Judge Xinis would have "afford[ed] uniform preliminary relief," but for a then-controlling 2-1 Fourth Circuit decision. *See id.* at 971 (citing *Casa de Md., Inc. v. Trump*, 971 F.3d 220 (4th Cir. 2020)). That case is why Judge Xinis limited "relief to the members of . . . the two organizational plaintiffs." *Id.* at 972. But after Judge Xinis ruled, the Fourth Circuit granted rehearing en banc, *see Casa de Md., Inc. v. Trump*, 981 F.3d 311 (4th Cir. 2020), and the Biden administration later dismissed the appeal. That earlier Fourth Circuit decision thus poses no bar to granting uniform relief here. *See City of Columbus*, 796 F. Supp. 3d at 176 n.26 (distinguishing Judge Xinis's decision).

***Bond.*** Because the government did not "request a specific amount in bond" or present any "non-speculative assertion of potential costs and damages," "a nominal bond is appropriate" — $100 — as security for a preliminary injunction. *Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822, 861 (D. Md. 2025); *see also Maryland v. Corp. for Nat'l & Cmty. Serv.*, 785 F. Supp. 3d 68, 125-26 (D. Md. 2025) ($100 bond).

However, if the Court stays Section 155.220(o) or the moratorium under 5 U.S.C. § 705, no bond is required. *See League of Women Voters*, 839 F. Supp. 3d at 352.

## II. Although Likely No Longer Needed, NABIP Would Also Be Entitled to Mandamus

NABIP sought mandamus because it was unclear what CMS would do if the Court enjoined or stayed the moratorium — that is, if CMS would engage in a "pocket moratorium," Hr'g Tr. at 32:24-33:1, by refusing to let new agents and brokers complete the training and register. The government now agrees that, "[s]hould the Court find that a stay of the moratorium is warranted, CMS will make training for new agents and brokers available by the close of the

next business day." PI Opp'n at 21; *accord* Wu Decl. ¶ 16. Assuming the government is not playing word games — and it will permit new agents and brokers who complete training to register by signing the required agreements with CMS[3] — the Court can deny the motion for mandamus as moot. But if preliminarily enjoining or staying the moratorium is not enough to cause CMS to permit new agents and brokers who have completed the training to then register so they can help clients select their health-care plan, the Court should grant mandamus and compel CMS to do so.

### A. Without the Moratorium, Any Continued Refusal To Allow New Agents and Brokers for Plan Year 2027 Unlawfully Withholds Required Action

If CMS were to refuse to allow new agents and brokers to register after the Court enjoins or stays the moratorium, CMS would be unlawfully withholding required regulatory action. Agency action can be "demanded by law" not only by federal statute, but also by "agency regulations that have the force of law." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004); *see also Lovo v. Miller*, 107 F.4th 199, 212 (4th Cir. 2024) ("A regulation can mandate action even if a statute does not."); *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 22 (D.D.C. 2017) (then-Judge Jackson) (same). Here, the ACA and HHS's regulations combine to require CMS to let agents and brokers register before open enrollment starts.

To start, under the ACA, "[t]he Secretary shall require . . . annual open enrollment periods, as determined by the Secretary." 42 U.S.C. § 18031(c)(6)(B). The Secretary has set November 1 as the start date for open enrollment, including for Plan Year 2027. *See* 45 C.F.R. § 155.410(e)(5)(i); Interim Final Rule, 91 Fed. Reg. at 60324. Another HHS rule grants individuals seeking to purchase a health-care plan through the Federally-facilitated Exchange the

---

[3] As CMS's documents explain, the next steps after training are signing agreements with CMS and confirming registration. *See* Angstreich Decl. ¶ 3 & Ex. B. Those were also the post-training steps for new agents and brokers in Plan Year 2026. *See id.* ¶ 2 & Ex. A.

right to obtain assistance from agents and brokers. *See* 45 C.F.R. § 155.220(c) ("A qualified individual may be enrolled . . . through the Exchange with the assistance of an agent[ or] broker . . . ."). And HHS has made training a prerequisite to agent and broker registration. *See id.* § 155.220(d).

Read together, these regulations impose on CMS a legal duty to let agents and brokers register before open enrollment starts — otherwise, qualified individuals could *not* be enrolled with the help of an agent or broker. CMS's actions comport with that reading of the statute and rules: CMS has started training and enabled registration before open enrollment in every prior ACA year, without fail. *See* Compl. ¶ 23; Interim Final Rule, 91 Fed. Reg. at 60324.

The government, however, asserts that "there is no 'specific schedule' or deadlines (statutory, regulatory, or otherwise) governing when, or even if, CMS must provide training to new agents and brokers." PI Opp'n at 14; *see id.* at 16, 18.[4] The government's argument is not limited to *new* agents and brokers; it contends "Congress imposed no requirement on CMS to conduct agent and broker training" of any kind. *Id.* at 16. Thus, the government's position is that, through inaction, CMS could render 45 C.F.R. § 155.220(c) a dead letter — without training, agents or brokers cannot provide "the assistance" that Section 155.220(c) says will be available. That is a nonsensical reading of that binding rule, about which the government says nothing.

In addition, the entire good cause argument hinges on CMS being obligated to let agents and brokers train and register before open enrollment. HHS promulgated Section 155.220(o) "to establish the authority for CMS to impose a temporary moratorium." 91 Fed. Reg. at 60323. If CMS had no legal obligation to hold training or allow trained agents and brokers to register,

[4] Although the Court directed the government to address in its opposition "the mandamus issues, the unlawfully withheld argument, and the TRAC factor argument," Hr'g Tr. at 48:21-23, the government addresses only the unreasonably delayed prong of 5 U.S.C. § 706(1).

HHS would not have needed to "establish" moratorium "authority" — CMS could have imposed a moratorium through a refusal to start training. And that refusal alone would have prevented the "approximately 19,000 new agents and brokers [who] would have registered" between September 22, 2026, and February 1, 2027, "absent the temporary moratorium." *Id.* at 60325. The Interim Final Rule thus confirms CMS's legal obligation to conduct training and permit registration before open enrollment.

HHS promulgated the moratorium rule so CMS could avoid that legal obligation. With the moratorium stayed or enjoined, CMS has no authority to withhold training or prevent trained agents and brokers from registering. CMS's commitment to "make training for new agents and brokers available by the close of the next business day" after the Court enjoins or stays the moratorium rule, PI Opp'n at 21; *accord* Wu Decl. ¶ 16, is an implicit admission of as much. Given that commitment, the Court should not need to order CMS to abide by its legal obligation. But if CMS will not commit to letting trained new agents and brokers register, the Court must order CMS to perform that unlawfully withheld action. *See South Carolina v. United States*, 907 F.3d 742, 756 (4th Cir. 2018) ("If the agency's legal obligation falls within the scope of § 706(1)," an order to "secure the agency's compliance with the law" "must issue regardless of equitable or policy considerations.").

### B. Alternatively, Without the Moratorium, Any Continued Refusal To Allow New Agents and Brokers for Plan Year 2027 Unreasonably Delays Required Action

Even if not legally required, it would be unreasonable for CMS to delay allowing new agents and brokers to complete training and register after the Court enjoins or stays the moratorium. The *TRAC* factors overwhelmingly favor NABIP. And there are no factual disputes that could prevent the Court from finding an unreasonable delay at this stage.

*First*, CMS's own past practice establishes the relevant rule of reason. There is no dispute that CMS has always started training sufficiently before open enrollment starts so agents and brokers can complete training and register in time to assist individuals on November 1. *See* Compl. ¶ 23; Interim Final Rule, 91 Fed. Reg. at 60324. CMS's Plan Year 2026 webinar for new agents and brokers stressed that they "play a crucial role in educating consumers about the Marketplace, both *during the annual Open Enrollment Period (OEP)* and throughout the Plan Year." Angstreich Decl. ¶ 6 & Ex. C. CMS's fact sheet for Plan Year 2025 open enrollment bragged that "more than 64,000 Marketplace-registered agents and brokers will be available to work with consumers," with more "complet[ing] training before November 1." *Id.* ¶ 7 & Ex. D. The Plan Year 2026 open enrollment fact sheet similarly told consumers how "to be contacted by a Marketplace-registered agent or broker." *Id.* ¶ 8 & Ex. E.

The government has no answer to that history other than to assert that the "tasks that CMS wants to implement to protect consumers and the integrity of the Exchanges" means that "CMS has a 'rule of reason' in delaying training for some agents and brokers." PI Opp'n at 16. But that is just another way of arguing that CMS did not need Section 155.220(o) to prevent new agents and brokers from registering for Plan Year 2027 before open enrollment starts. As shown above, the Interim Final Rule says otherwise — that new rule is what "establish[ed] the authority for CMS to impose a temporary moratorium." 91 Fed. Reg. at 60323.

*Second*, the government argues that the absence of a statutory deadline cuts in its favor. *See* PI Opp'n at 14. But "when no statute sets a deadline for an agency action, the second *TRAC*

factor is not relevant to an 'unreasonably delayed' analysis." *Barrios Garcia v. U.S. Dep't of Homeland Sec.*, 25 F.4th 430, 453 (6th Cir. 2022).[5]

*Third*, the moratorium will harm human health and welfare. The government's own data show a shortage of registered agents and brokers, as compared to last year — a shortage that a new prohibition on clerical staff performing certain tasks exacerbates. *See supra* Part I.C. Those are the public health harms NABIP identified in its complaint, *see* Compl. ¶ 66, so the government is wrong to assert otherwise, *see* PI Opp'n at 20. And courts have recognized similar harms to the public under this factor. *See Nat'l Fair Hous. All. v. U.S. Dep't of Hous. & Urb. Dev.*, 2025 WL 2105567, at *10 (D.D.C. July 28, 2025).

*Fourth*, the government has not shown that making training available to new agents and brokers — which the government can do in a day, *see* Wu Decl. ¶ 19; Parish Decl. ¶ 9 — would interfere with any higher or competing priorities. CMS has also already "implemented the program integrity measures," Wu Decl. ¶ 13, so starting training cannot prevent that. The claim that letting new agents and brokers register "compete[s] with" efforts "to protect consumers and the integrity of the Exchanges," PI Opp'n at 18, is a justification for a moratorium rule — not for delay in the absence of the new authority Section 155.220(o) provided.

*Fifth*, NABIP members are experiencing irreparable harm growing each day of delay, which satisfies this factor. *See, e.g.*, *Yazdan Pouri v. U.S. Dep't of Homeland Sec.*, 2026 WL 1508425, at *9 (D.D.C. May 30, 2026); *Nat'l Fair Hous. All.*, 2025 WL 2105567, at *10.

---

[5] The government also suggests that the *TRAC* factors might not "appl[y] . . . when there is no statutory deadline." PI Opp'n at 13 n.2. But the Fourth Circuit holds the *TRAC* factors are relevant to identifying unreasonable delay where Congress did *not* impose a date-certain deadline. *See South Carolina*, 907 F.3d at 759-60.

*Sixth*, the government's refusal to tell this Court what was in the document CMS sent to OMB or why it canceled the August webinar — both get only a single, shared sentence, *see* PI Opp'n at 9 — suggests the document and reasons would reveal bad faith. While not necessary to find unreasonable delay, the reasonable inference from that silence supports NABIP.

In sum, five of the six *TRAC* factors favor NABIP; the sixth is inapplicable. While unreasonable delay claims are not always resolvable at a preliminary stage, this is not one of those cases. Unlike in *Gonzalez v. Cuccinelli*, 985 F.3d 357 (4th Cir. 2021), there are no disputed facts "about how the agency implements its rules and exceptions." *Id.* at 375. And *Gonzalez* sought to compel the agency to adjudicate individual U-Visa petitions, for which the government could face real "resource constraints" that could force choices between "competing priorities." *Id.* But CMS can start the training in a day. There are no genuine disputes of material fact. Therefore, if the Court concludes that this is an unreasonable delay case under Section 706(1) and if mandamus relief is necessary, the record supports granting it.

## CONCLUSION

The Court should grant this motion and preliminarily enjoin or stay Section 155.220(o) and the moratorium CMS imposed under that rule. Given CMS's commitment that such a ruling will lead it to turn on the training the next day — and assuming CMS commits to let those trained new agents and brokers register — NABIP needs no further relief. But if such relief is needed, the Court should grant that relief as well.

Dated: November 4, 2026

Respectfully submitted,

*/s/ Scott H. Angstreich*
Joshua D. Branson (Bar No. 29536)
Scott H. Angstreich (admitted *pro hac vice*)
Kenneth M. Fetterman (admitted *pro hac vice*)
Eliana Margo Pfeffer (admitted *pro hac vice*)
Christie M. Lawrence (admitted *pro hac vice*)
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
1615 M Street N.W., Suite 400
Washington, DC 20036
Tel.: (202) 326-7900
Fax: (202) 326-7999
jbranson@kellogghansen.com
sangstreich@kellogghansen.com
kfetterman@kellogghansen.com
epfeffer@kellogghansen.com
clawrence@kellogghansen.com

*Counsel for Plaintiff National Association of Benefits and Insurance Professionals*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 4th day of November, 2026, I served a copy of the foregoing Plaintiff's Reply in Support of Motion for a Temporary Restraining Order, Preliminary Injunctive Relief, and a Writ of Mandamus via certified mail to:

Robert F. Kennedy, Jr.
United States Department of Health and Human Services
200 Independence Avenue, SW
Washington, D.C. 20201

Dr. Mehmet Oz
The Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, MD 21244

Todd Blanche
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Tel.: (202) 514-2000

*Counsel for Defendants*

Kelly O. Hayes
United States Attorney for the District of Maryland
U.S. Attorney's Office, District of Maryland
36 S. Charles Street 4th Fl.
Baltimore, MD 21201
Tel.: (410) 209-4800

*Counsel for Defendants*

*/s/ Scott H. Angstreich*
Scott H. Angstreich